## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN NURSES ASSOCIATION; AMERICAN ASSOCIATION OF NURSE ANESTHESIOLOGY; NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH; NATIONAL ASSOCIATION OF CLINICAL NURSE SPECIALISTS; AMERICAN COLLEGE OF NURSE-MIDWIVES; AMERICAN HOLISTIC NURSES ASSOCIATION; ASSOCIATION OF PEDIATRIC HEMATOLOGY/ONCOLOGY NURSES; ASSOCIATION OF WOMEN'S HEALTH, OBSTETRIC AND NEONATAL NURSES; CHI ETA PHI SORORITY, INC.; HEALTH MINISTRIES ASSOCIATION; NATIONAL RURAL HEALTH ASSOCIATION,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA McMAHON, *in her official capacity as United States Secretary of Education*,

        Defendants.

Civil Action No.
1:26-cv-12443

### FIRST AMENDED COMPLAINT

### INTRODUCTION

1.  America's five million nurses are the backbone of our healthcare system. On National Nurses Day this year, the White House issued a statement acknowledging this country's reliance "on the compassionate service and steady commitment of our Nation's corps of nursing professionals," who "tend to what

matters most in life—safeguarding our health and protecting the well-being of those we love with unmatched resolve."[1] Nurses are in high demand throughout our healthcare system, but particularly in rural areas, which are expected to experience a 24% shortage of nurses by 2028.[2]

2.    In addition to the millions of dedicated registered nurses who work long hours to provide skilled and compassionate care, hundreds of thousands of Advanced Practice Registered Nurses (APRNs) are licensed to provide specialized healthcare, including diagnosing conditions, ordering and interpreting clinical tests, administering and providing anesthesia care, delivering babies, and managing chronic health conditions. They are also key to addressing systemic issues in our healthcare system, including the projected shortfall of primary care physicians.[3] They have earned not only our gratitude and respect, but also the financial support of the federal government, which has taken steps to "help[] nurses . . . build the financial security they have long deserved."[4]

3.    These advanced nurses have pursued education beyond their bachelor's degrees, obtaining advanced degrees that include the Master of Science in Nursing (MSN), the Doctor of Nursing Practice (DNP), the Doctor of Nursing Anesthesia Practice (DNAP), and the Doctor of Philosophy in Nursing (PhD). These degree

---

[1] *Presidential Message on National Nurses Day*, The White House (May 6, 2026), https://www.whitehouse.gov/briefings-statements/2026/05/presidential-message-on-national-nurses-day/.

[2] Nat'l Ctr. for Health Workforce Analysis, *Nurse Workforce Projections, 2023-2038*, HRSA Health Workforce 1 (Dec. 2025), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/nursing-projections-factsheet.pdf.

[3] *See* Nat'l Ctr. for Health Workforce Analysis, *State of the Primary Care Workforce, 2025*, HRSA Health Workforce 1, 3-4 (Dec. 2025), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/State-of-the-Primary-Care-Workforce-2025.pdf (noting that an estimated 374,970 nurse practitioners specialize in primary care and explaining their importance in providing such care in rural areas).

[4] *Presidential Message on National Nurses Day,* The White House (May 6, 2026), https://www.whitehouse.gov/briefings-statements/2026/05/presidential-message-on-national-nurses-day/.

programs prepare students to pursue APRN professions as certified nurse midwives, clinical nurse specialists, certified registered nurse anesthetists, and nurse practitioners. And they ensure that nurses are educated and trained in the profession so that they can teach the next generation of nurses across all levels of practice.

4.      Advanced nursing degrees, like many professional degrees, are a significant financial commitment—a typical advanced nursing degree can exceed $38,000 per year and total in-state tuition and fees for a DNP in nurse anesthesia can cost more than $100,000.[5] Many nurses who elect to pursue these advanced degrees rely on federal loans, and the financial benefits they provide, to finance their post-baccalaureate nursing education. And more than a quarter of advanced practice nurses with loans report balances above $100,000.[6]

5.      In July 2025, Congress enacted new borrowing limits for direct federal loans in the One Big Beautiful Bill Act (OBBBA or Act), Pub. L. No. 119-21, § 81001, 139 Stat. 72, 334-35 (July 4, 2025). Under the new borrowing limits, "professional student[s]" may borrow up to $50,000 annually ($200,000 in aggregate), while "graduate student[s]" may borrow up to $20,500 annually ($100,000 in aggregate). 20 U.S.C. § 1087e(a)(4)(A).

6.      Congress defined "professional student" by incorporating the Department of Education's pre-existing regulatory definition of "professional degree." 20 U.S.C. § 1087e(a)(4)(C)(ii). Under the statutory definition, a professional student is pursuing "[a] degree that signifies both completion of the academic requirements

---

[5] *See* Am. Ass'n of Colls. of Nursing, *Assessing the Impact of Federal Loan Limits on Post-Baccalaureate Nursing Education: Perspectives from Deans and Students* 4 (Dec. 2025), https://www.aacnnursing.org/Portals/0/PDFs/Data/AACN-Data-Loan-Cap-Survey-Report-December-2025.pdf (cost of advanced nursing degree); Univ. of Tenn. Knoxville, *Graduate Tuition & Fees* (Jan. 2025), https://nursing.utk.edu/graduate-tuition-and-fees/ (cost of nurse anesthesia degree).

[6] Christopher R. Friese et al., *Nurses Carry Substantial Student Loans: Health Care Workforce Implications*, Health Affairs Scholar (Jan. 16, 2026), https://doi.org/10.1093/haschl/qxag019.

for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree" and generally requires "[p]rofessional licensure." 34 C.F.R. § 668.2 (2025). This three-part definition is followed by a varied list of "[e]xamples of a professional degree" that specifically states that professional degrees are "not limited to" those examples. *Id.* Because advanced nursing degrees satisfy these three criteria, they qualify under the statute for the higher federal student loan caps available to "professional students."

7.     Notwithstanding the statutory test, on May 1, 2026, the Department of Education promulgated a Final Rule, 91 Fed. Reg. 23768, that excludes advanced nursing students from the definition of "professional student." The Department concedes that advanced nursing students "appear[ ] to satisfy" the statutory "three-part test" for a "professional student." *Id.* at 23795, 23797, 23798. Yet the Final Rule excludes these students from the definition of "professional student" by imposing new requirements that appear nowhere in the statute. The Department claims that advanced nursing students "do not satisfy the *contextual requirements* provided by the *illustrative list* of advanced degrees included within the definition of professional student." *Id.* (emphases added). But the scope of examples in that list underscores that a variety of degrees meet the statutory criteria. The non-exhaustive list contains professions from doctors and dentists to lawyers and pastors. 34 C.F.R. § 668.2. Veterinarians are on the list; so are podiatrists, optometrists, and theologians. *Id.* And the list includes both doctoral degrees and master's degrees. *Id.* This varied list emphasizes that a "professional degree" can be any credential that satisfies the three-part definition.

8.     To the extent that the Final Rule's definition of "professional student" excludes advanced nursing students, it contradicts the OBBBA's statutory definition and violates the Administrative Procedure Act (APA). The Final Rule is also arbitrary and capricious and not the product of reasoned decision-making. The Department

relied on factors that Congress did not intend for it to consider, engaged in inconsistent and unsupported reasoning, and failed meaningfully to engage with public comments.

9.     If the Final Rule takes effect, many nurses will be forced to forgo the advanced nursing programs they had planned on attending because they will not be able to afford them. Potential students without the means to pay out-of-pocket will have no choice but to take on crushing, higher-interest debt or abandon their career aspirations. The Department acknowledges as much in the cost analysis for the Final Rule. 91 Fed. Reg. at 23856. This means fewer advanced nurses to deliver babies, anesthetize patients, fill gaps in rural healthcare, and teach the next generation of nurses.

10.     The Court should declare the challenged portions of the Final Rule to be unlawful, vacate those portions of the final rule, and enjoin Defendants from enforcing or implementing the Final Rule to exclude advanced nursing students from the definition of "professional student."

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(2) because defendants are an agency and official of the United States.

12.     The Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705-706, and the Court's inherent authority to enjoin federal officials from violating the law.

13.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because defendants are agencies of the United States and officers of the United States acting in their official capacity, no real property is at issue in this case, and plaintiff National Association of Clinical Nurse Specialists resides in this district.

**PARTIES**

14.     Plaintiff the American Nurses Association (ANA) is a national, not-for-profit organization headquartered in Silver Spring, Maryland. ANA represents the interests of the nation's 5 million registered nurses, including nurses with advanced degrees. ANA advances the nursing profession by fostering high standards of nursing practice, promoting a safe and ethical work environment, bolstering the health and wellness of nurses, and advocating on health care issues that affect nurses and the public. ANA also provides continuing education and professional development for nurses, including advanced nurses, and publishes guidelines for the profession, including the *Code of Ethics for Nurses* and *Nursing: Scope and Standards of Practice*.[7] ANA is affiliated with 51 constituent and state nurses associations, and its membership includes hundreds of thousands of nurses across the U.S.

15.     Plaintiff the American Association of Nurse Anesthesiology (AANA) is a national, not-for-profit organization headquartered in Rosemont, Illinois. AANA supports and represents certified registered nurse anesthetists and current and potential nurse anesthesiology residents. Through advocacy, education, research, and professional resources, AANA works to advance the nurse anesthesiology profession and help improve patient care. Representing more than 69,000 members, AANA promotes policies that support patient access to anesthesia care and continuing education and professional development.

16.     Plaintiff National Association of Nurse Practitioners in Women's Health (NPWH) is a national not-for-profit organization based in Washington, DC. It

---

[7] ANA, *What is the Code of Ethics for Nurses?* (last visited May 29, 2026), https://codeofethics.ana.org/home (explaining that the *Code of Ethics for Nurses* provides the definitive standard for ethical nursing practice); ANA, *Nursing: Scope and Standards of Practice, 4th Edition* (last visited May 29, 2026), https://www.nursingworld.org/nurses-books/nursing-scope-and-standards-of-practice-4th-edit/.

represents more than 13,000 Women's Health Nurse Practitioners, students, and other advanced practice registered nurses who provide women's healthcare. NPWH offers high-quality continuing education, advocacy, career tools, resources and community for clinicians nationwide, and sets the standard of practice and education for the Women's Health Nurse Practitioner profession.

17.    Plaintiff the National Association of Clinical Nurse Specialists (NACNS) is a national, not-for-profit organization headquartered in Wakefield, Massachusetts. NACNS serves as the national authority on clinical nurse specialists' practice, education, and research. Its mission is to advocate and advance the expertise and value that clinical nurse specialists contribute to health care through policy, collaboration, and professional development.

18.    Plaintiff the American College of Nurse-Midwives (ACNM) is a national, not-for-profit organization headquartered in Washington, DC. ACNM represents advanced practice midwives, including certified nurse-midwives and certified midwives. Its mission is to support midwives, advance the practice of midwifery, and further health outcomes for the public.

19.    Plaintiff American Holistic Nurses Association (AHNA) is a national not-for-profit organization based in Topeka, Kansas. AHNA serves over 5,500 nurses and holistic healthcare professionals in the U.S. and internationally, including advanced practice holistic nurses. Holistic nurses are legally licensed nurses who use nursing knowledge, theories, and expertise to recognize and care for the totality of the human being within the scope and standards of their state and the Holistic Nursing specialty. AHNA co-publishes the scope and standards of practice for holistic nursing and works to further holism in nursing practice, community, advocacy, research, and education.

20.    Plaintiff Association of Pediatric Hematology/Oncology Nurses (APHON) is a national, not-for-profit organization based in McLean, Virginia. It is

the professional organization for pediatric hematology/oncology nurses, including advanced practice nurses, as well as other pediatric hematology/oncology healthcare professionals. Its mission is to support and advance nurses in optimizing outcomes for children, adolescents, young adults, and their families through the continuum of care for blood disorders and cancers. To further that mission, APHON works to develop educational content, deliver informative programs, promote the latest evidence-based practice guidelines, and provide resources to the pediatric, adolescent, and young adult communities and their families.

21. Plaintiff Association of Women's Health, Obstetric and Neonatal Nurses (AWHONN) is a national, not-for-profit organization based in Washington, DC. Its mission is to promote and advocate excellence in nursing practice, education and research in the women's health, obstetric and neonatal health care field, so as to improve the health care delivery and outcomes of women, newborns, and their families. To further that mission, AWHONN offers research, courses, and publication resources to clinical nurses to help them deliver informed, high-quality care.

22. Plaintiff Chi Eta Phi Sorority, Inc. (Chi Eta Phi) is a national not-for-profit organization based in Washington, DC. It is a professional organization for registered professional nurses and student nurses. It has more than 8,000 registered nurse and student nurse members and over 101 graduate chapters and 41 undergraduate chapters located in 33 states, the District of Columbia, St. Thomas, and the U.S. Virgin Islands.

23. Plaintiff Health Ministries Association (HMA) is a national, not-for-profit organization based in Glenview, Illinois. It is the recognized professional membership association for the nursing specialty of faith community nursing. Its mission is to encourage, support and empower leaders in the integration of faith and health in their local communities. To that end, HMA promotes education, research

utilization, and evidence-based practice, and co-authors the Faith Community Nursing Scope and Standards of Practice.

24. Plaintiff National Rural Health Association (NRHA) is a national, not-for-profit organization headquartered in Overland Park, Kansas. Its mission is to improve the health and well-being of rural Americans and their communities through advocacy, communications, education, and research. NRHA has over 21,000 members nationwide, including rural community hospitals, critical access hospitals, doctors, nurses, and students in health-related fields.

25. Defendant U.S. Department of Education is an executive department of the United States government.

26. Defendant Linda McMahon is the Secretary of the U.S. Department of Education. Secretary McMahon is that agency's highest-ranking official and is charged with the supervision and management of all decisions and policies of the Department. She is sued in her official capacity.

## BACKGROUND

### A. Advanced Practice Registered Nurse Professions

27. APRNs serve a critical role in our nation's healthcare system. They are registered nurses educated at a master's-level or higher and are licensed in advanced practice. To become an APRN, students must complete a post-baccalaureate program from an accredited institution, pass a national certification examination, and obtain a license. These post-baccalaureate nursing degrees include the MSN, DNP, DNAP, and PhD in Nursing. Among those who hold these degrees, the National Council of State Boards of Nursing recognizes four APRN roles with responsibilities across the spectrum of healthcare services: certified nurse-midwives, certified registered nurse anesthetists, clinical nurse specialists, and nurse practitioners.

28. Certified nurse-midwives offer primary, gynecological, and reproductive care. They provide care throughout pregnancy, including during labor and birth,

administer annual exams and preventative visits, perform medical procedures, and prescribe medications and order diagnostic tests. They practice in clinics, offices, hospitals, birth centers, and patients' homes.

29. Certified registered nurse anesthetists are trained and certified to provide anesthesia and pain management care and related services in every type of healthcare setting and to every type of patient. They administer anesthetics and provide care before, during, and after surgical, therapeutic, diagnostic, and obstetrical procedures. Certified registered nurse anesthetists represent over 50% of anesthesia providers in the United States. In some states, they are the sole anesthesia providers in rural hospitals, providing those hospitals the capability to perform obstetrical, surgical, trauma stabilization, and pain-management services. A DNP in nurse anesthesia or DNAP is required to become a certified registered nurse anesthetist.

30. Clinical nurse specialists provide primary care and manage acute and chronic illness, with an emphasis on specialist care for at-risk patients and populations. In addition to diagnosing and treating patients, they provide expertise and support to other nurses caring for patients, help drive practice changes throughout healthcare organizations, and ensure use of best practices and evidence-based care.

31. Nurse Practitioners provide primary, acute, and specialty healthcare services to patients in nearly every setting, including hospitals, emergency rooms, physicians' offices, and Veterans Affairs facilities. Nurse practitioners provide many of the same services as physicians, including diagnosis, treatment, and ongoing care. They can also prescribe medication, order tests, and perform medical procedures.

32. The graduate degrees necessary to enter these advanced nursing fields are academically rigorous. MSN, DNP, and DNAP degrees require comprehensive graduate-level courses in advanced physiology and pathophysiology, advanced health

assessment, and advanced pharmacology, as well as a minimum of 500 hours of post-baccalaureate clinical training, with a DNP in nurse anesthesia or DNAP requiring a minimum of 2,000 clinical hours. Students pursuing PhDs in Nursing typically already have at least an MSN and must complete intensive doctoral-level coursework that equips graduates to be leaders in their field and educators for nurses across all levels of practice. Full-time MSN programs typically take two to three years to complete, while full-time doctoral-level programs often require three to five years.

**B.  The Federal Student Loan Program**

33.  Congress enacted the Higher Education Act of 1965 (HEA) "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219. Under Title IV of the HEA, as amended, the federal government offers loans directly to students under the William D. Ford Federal Direct Loan Program (Direct Loan Program).

34.  Four types of loans are available under the Direct Loan Program: Direct Unsubsidized Loans, Direct Subsidized Loans, Direct PLUS Loans, and Direct Consolidated Loans. Borrowers may qualify for different types of loans depending on their financial status and the level of education they are pursuing. *See* 20 U.S.C. § 1087e.

35.  Prior to July 4, 2025, graduate and professional students could obtain Direct Unsubsidized Loans up to $20,500 per year ($138,500 in aggregate). 34 C.F.R. § 685.203 (2025); *see* 91 Fed. Reg. 4254, 4268 (Jan. 30, 2026). Graduate and professional students in need of additional financial assistance could obtain Direct PLUS Loans (also known as Grad PLUS loans), available at a higher interest rate than Direct Unsubsidized Loans, to cover up to the full cost of attendance.

36.  Because federal loans are made by the government, with terms and conditions set by law, they include "many benefits . . . not typically offered with

11

private loans."[8] Among these benefits, federal loans have fixed interest rates that are often lower than private loans, there are several options for repayment plans that provide flexibility, and loan forgiveness options are available. *Id.*

### C.    The One Big Beautiful Bill Act

37.    On July 4, 2025, Congress made certain changes to the Direct Loan Program as part of H.R. 1, or the "One Big Beautiful Bill Act," Pub. L. No. 119-21, tit. VIII, subtitle B, § 81001, 139 Stat. 72, 334 (OBBBA or Act).

38.    As relevant here, the Act discontinues Direct PLUS Loans for graduate and professional students, 20 U.S.C. § 1087e(a)(3)(C), and establishes new borrowing limits for those students for Direct Unsubsidized Loans. Under the new borrowing limits, "professional student[s]" may borrow up to $50,000 annually ($200,000 in aggregate), while "graduate student[s]" may borrow up to $20,500 annually ($100,000 in aggregate). *Id.* § 1087e(a)(4).

39.    The Act also establishes a "lifetime maximum aggregate" borrowing amount of $257,500 for all student borrowers. *Id.* § 1087e(a)(6).

40.    The Act contains an "[i]nterim exception" providing that a student is not subject to these changes for the duration of their "expected time to credential," so long as the student is "enrolled in a program of study at an institution of higher education" and "has received a loan" for that program of study as of June 30, 2026. *Id.* § 1087e(a)(4), (8).

41.    The Act defines "graduate student" and "professional student" for purposes of the new loan limits.

42.    The term "graduate student" is defined as "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *Id.* § 1087e(a)(4)(C)(i).

---

8 *See* Federal Student Aid, *Federal Versus Private Loans,* https://studentaid.gov/understand-aid/types/loans/federal-vs-private (last visited May 28, 2026).

43.   The term "professional student" is defined as "a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program." *Id.* § 1087e(a)(4)(C)(ii).

44.   As of the date of the Act's enactment, the definition of "professional degree" in 34 C.F.R. § 668.2 provided as follows:

> *Professional degree*: A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree *include but are not limited to* Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2 (2025) (emphasis added).

45.   This definition of "professional degree" was first promulgated by the Department in 2007. 72 Fed. Reg. 62014 (Nov. 1, 2007). The 2007 rulemaking recognized that the Department's regulations to that point lacked a definition for "professional degree," but had contained "three definitions of graduate or professional student." 72 Fed. Reg. 44620, 44621-22 (Aug. 8, 2007) (notice of proposed rulemaking). The Department added a definition for "professional degree" and consolidated and harmonized other definitions. 72 Fed. Reg. at 62014, 62025. The definition of "professional degree" in 34 C.F.R. § 668.2 remained unchanged from its adoption through Congress incorporating it into the OBBBA.

**D.   The Department's Rulemaking**

46.   After the OBBBA became law, the Department of Education established a negotiated rulemaking committee—the Reimagining and Improving Student Education (RISE) Committee—to negotiate proposed regulations implementing the

13

Act's changes. *See* 20 U.S.C. § 1098a(b)(1). The Committee met from September 29 to October 3, 2025, and from November 3 to November 6, 2025.

47.    At the beginning of the committee negotiations, the Department circulated a proposal that would have defined a "professional degree" as only the 10 professions (and 16 professional degrees) provided as illustrative "examples" in 34 C.F.R. § 668.2. The Department's proposal stated that any other professional degrees would have to be designated by the Secretary of Education through separate rulemaking.[9]

48.    Participants in the negotiated rulemaking process objected to the proposal as diverging from the regulatory text, which provides a "non-exhaustive list of examples," and warned that the "proposed language risks excluding students in rigorous, licensure-dependent programs not explicitly named, despite meeting the established criteria."[10]

49.    The Department amended its proposal during the course of the RISE committee negotiations and published a Notice of Proposed Rulemaking (NPRM) on January 30, 2026.  91 Fed. Reg. 4254.

50.    The NPRM recognized that the OBBBA "borrowed and codified the Department's regulatory definition of the term 'professional degree' in 34 C.F.R. § 668.2." *Id.* at 4262. The Department also recognized that the incorporated regulation, and thus the "operative definition" of professional degree in the OBBBA, "establishes a three-part test": (1) "the degree must signify completion of the academic requirements for beginning practice in a given profession," (2) "the

---

[9] *See* RISE Negotiated Rulemaking, Session 1 Discussion Paper and Proposed Regulatory Text: Loan Limit Provisions and Definitions (Sept. 29, 2025), https://www.ed.gov/media/document/rise-discussion-paper-loan-limits-685102-685200-685201-685203-september-29-pm-version-112442.pdf.

[10] RISE Negotiated Rulemaking Issue Paper: Loan Limit Provisions and Definitions,        https://www.ed.gov/media/document/rise-2025-loan-limit-definitions-lily-112447.pdf (Sep. 30, 2025).

profession the graduate enters must require a level of professional skill beyond what is normally required for a bachelor's degree," and (3) the profession must "generally require[] professional licensure." *Id.* at 4262.

51.    The NPRM explained that, in addition to this "operative test," the Department had relied on "contextual clues" from the "illustrative list of advanced degrees" that were "codified by Congress into the definition as examples." *Id.* The Department identified what it viewed as "implicit[]" "common element[s] among the statute's illustrative examples." *Id.* at 4264; *see id.* at 4262.

52.    The NPRM's proposed definition of "professional degree" provided:

(1) A professional degree is a degree that:

> (i) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;

> (ii) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;

> (iii) Generally requires professional licensure to begin practice; and

> (iv) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition.

(2) A professional degree may be awarded in the following fields:

> (i) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

(3)  A professional student under this definition:

> (i) May not receive title IV aid as an undergraduate student for the same period of enrollment; and

15

(ii) Must be enrolled in a program leading to a professional degree under paragraph (2) of this definition.

*Id.* at 4332-33; *see id.* at 4260-61.

53.     Thus, in addition to the three criteria set forth in 34 C.F.R. § 668.2, the NPRM added that a professional degree must "generally [be] at the doctoral level" and require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." *Id.* at 4260-61. The NPRM also eliminated from the statutory definition the "include but are not limited to" language before the illustrative list of "professional degrees." *Id.*; *see id.* at 4332-33. It added that a professional student "[m]ust be enrolled" in one of the listed degree programs. *Id.* at 4332-33. The NPRM further required that the degree must "[i]nclude[] a four-digit program Classification of Instructional Program (CIP) code . . . in the same intermediate group" as the listed fields. *Id.* Those listed fields now include the 10 fields provided as illustrative examples in the statutory definition, plus Clinical Psychology, which the Department added at the recommendation of RISE committee members. *Id.*; *see also id.* at 4263-64.

54.     The CIP code system was developed by the Department of Education's National Center for Education Statistics and provides a scheme for the tracking and reporting of fields of study and program completion activity. A specific instructional program is assigned a unique six-digit CIP code. CIP codes are also grouped at the two-digit and four-digit level. Advanced nursing degrees share the same two-digit CIP code as other healthcare professions and related clinical sciences. They do not share a four-digit CIP code with any of the listed professions in the illustrative examples.

55.     The NPRM recognized that the Department had "heard from many who claimed that certain degree programs should be considered professional degree programs," including advanced nursing degrees. *Id.* at 4265. The Department

16

explained that it was "hesitant to treat" advanced nursing degrees as professional degrees because the practice authority for APRNs varies by state and certain states require APRNs to be supervised by physicians. *Id.* According to the Department, the degrees in the Act's "illustrative list" of professional degrees do not "require another profession to supervise their practice." *Id.* The Department thus did "not believe that the statute permits" it to classify advanced nursing degrees as professional degrees because, in its view, APRNs "must be supervised by another professional who has … more education, training, and qualifications." *Id.*

56.    The Department received more than 80,000 comments on its proposed rule.

57.    Thousands of commenters addressed the Department's exclusion of advanced nursing degrees from its definition of professional degrees, including individuals, states, and organizations. Among other issues, commenters explained that advanced nursing degrees meet the regulatory definition of "professional degree" that Congress incorporated into the OBBBA; that the agency's focus on state practice rules for APRNs has no nexus to the statutory language; and that the exclusion of advanced nursing degrees from the definition of "professional degrees" would harm the nursing profession and the communities they serve.

58.    Plaintiff ANA, for example, submitted a comment letter strongly urging the Department to classify post-baccalaureate nursing degrees (MSN, DNP, DNAP, and PhD) as professional degrees, explaining that the degrees satisfy the three-part test adopted by the OBBBA. The comment letter further explained ANA's strong disappointment that the agency had chosen to narrow the Act's three-part test by relying on outdated state regulations that required some APRNs to be supervised by physicians. The comment letter explained that 30 states and territories allow APRNs full practice authority, and that over half of the remaining states have either considered or currently have legislation introduced to further remove regulatory

barriers. ANA further explained that, to the extent states continue to restrict scope-of-practice, those laws have no bearing on whether advanced nursing degrees are professional degrees for purposes of the loan limits. ANA explained, moreover, that agencies under President Trump's leadership have recognized the importance of APRNs having full practice authority to meet increased demand and need for healthcare services, including in rural communities. ANA's comment letter also explained the critical need for adequate federal loan support for students pursuing advanced nursing degrees, and that excluding APRNs from the definition of "professional degrees," and thus the higher borrowing limits, would interfere with students' ability to pursue those degrees and further exacerbate nursing shortages.

59.    Plaintiff AANA also submitted a comment letter urging the agency to include post-baccalaureate nursing degrees as professional degrees, and in particular DNP and DNAP degrees. AANA opposed the agency's proposal to exclude Certified Registered Nurse Anesthetists and other advanced nursing professionals based on state supervision requirements, explaining that Certified Registered Nurse Anesthetists "have no physician supervision requirements in 44 states" (now 45 states) for anesthesia services under the nursing laws and that remaining "outdated supervision requirements" are not a basis to conclude that advanced nursing degrees are not professional degrees. AANA's comment letter further explained that the doctoral programs to become a Certified Registered Nurse Anesthetist, either a DNP or DNAP, typically carry heavy tuition costs, that the lower loan cap would make nurse anesthesia education financially infeasible for many students wishing to enter the profession, and that this in turn would have a devastating impact on the delivery of healthcare, particularly in rural areas, where Certified Registered Nurse Anesthetists represent more than 80 percent of anesthesia providers.

60.    At least two dozen state nursing associations also commented to oppose the Department's proposed rule. The South Carolina Nurses Association, for example,

stressed that APRNs are often the primary or only consistent provider available in vast parts of the state, and that limiting federal loan access for nurses would have a devastating effect on healthcare access for residents. Along similar lines, the Wyoming Nurses Association explained that Wyoming's healthcare infrastructure relies on APRNs, who have full practice authority and are often the primary (and sometimes only) healthcare provider for frontier communities.

**E.    The Final Rule**

61.    The Department promulgated a Final Rule on May 1, 2026. 91 Fed. Reg. 23768. The Final Rule made no changes to the NPRM's proposed definition of "professional degree."

62.    As in the NPRM, the Final Rule explained that in defining "professional degree," the Department relied on the "three-part operative test" from the Act as well as "contextual signs" the Department derived from "the illustrative list of professional degrees." *See id.* at 23784, 23791.

63.    The Final Rule acknowledged that "[m]any" commenters had urged the Department to include advanced nursing degrees as professional degrees. *Id.* at 23795. But the Department's Final Rule concluded that those degrees are not "professional degrees," and thus that advanced nursing degree students are not "professional students." The Department reached this conclusion despite explicitly recognizing that the MSN, DNP, and DNAP degrees "appear[] to satisfy the three parts of the operative test" in the Act. *Id.* at 23795-96 (explaining why "the MSN appears to satisfy the three parts of the operative test"); *id.* at 23797 ("Like the MSN, the DNP appears to satisfy the three parts of the operative test[.]"); *id.* at 23798 ("The DNP in Nurse Anesthesia and DNAP appear to satisfy the three parts of the operative test[.]"). The Department reasoned that advanced nursing degrees cannot qualify as professional degrees because they fail to meet "the contextual requirements imposed by the illustrative list" in the Act. *Id.* at 23795.

19

64.    The Final Rule also adhered to the NPRM's conclusion that advanced nursing degrees are not "professional degrees" because they lead to professions that "may require career-long supervision by persons in a different profession." *Id.* at 23796. The Department acknowledged that a substantial number of States allow full practice authority for APRNs, including, for example, that "[t]hirty-one States (as well as the District of Columbia and Guam) grant certified nurse midwives full independent practice and prescriptive authority," and "[t]hirty-five States (as well as the District of Columbia and Guam) grant nurse practitioners full independent practice and prescriptive authority." *Id.* But the Department stated that, in its view, it was "determinative" that "*any* State imposes any restrictions" because the degrees included in the illustrative list "grant unrestricted ability for holders of those degrees to practice that profession in every State without supervision by a professional licensed in another profession." *Id.* at 23797, 23799 (emphasis added).

65.    The Final Rule further explained that the MSN did not meet the definition of "professional degree" for the additional reason that it "is a master's-level degree, while the illustrative list suggests that a *professional degree* must *generally* be at the doctoral-level," though the Department recognized that "three non-doctoral degrees" are included in the "illustrative list." *Id.* at 23796. The Final Rule also found that the MSN "does not require the same amount of post-graduate training as other degrees included in the illustrative list" because if a student already has a Bachelor's degree in nursing, the MSN "may be completed in 18 months," and that it is "conceivably possible" that a student could obtain an MSN "in as little as one year." *Id.* at 23796.

66.    The Final Rule also stated that the DNP is not a "professional degree" because an individual with a DNP—"except in the case of DNPs in nurse anesthesia"—could enter the same professions as an individual with an MSN, but it is at a higher credential level. *Id.* at 23798. The Department concluded that is not

true with respect to the other professions in the illustrative list, though the Department acknowledged one "exception"—namely, "the L.L.B. and J.D." for Law. *Id.* The Department also concluded that, having found that the MSN is not a professional degree, "it would be illogical to treat a DNP" as a professional degree since both degrees lead to the same advanced nursing professions. *Id.*

67. The Final Rule explained that, in contrast to the illustrative list of professional degrees in the OBBBA's statutory definition, the list of professional degrees in the Final Rule's "definition of professional student is exhaustive." *Id.* at 23785 (emphasis omitted). The Final Rule deleted the language "include but are not limited to" before the list of professional degrees and specified that to qualify as a "professional student," a student "[m]ust be enrolled in a program leading to" one of the listed degrees. *Id.* at 23882-83.

68. The Final Rule further explained that the statute's "interim exception" for students who are enrolled in a program and borrowed financial aid as of June 30, 2026, does not apply once a student withdraws or transfers, even if the student transfers to the "same program of study" at a "different institution." *Id.* at 23814.

### F. The Final Rule Unlawfully Excludes Advanced Nursing Degrees from the Definition of "Professional Degree"

69. The Final Rule is contrary to law and exceeds the Department's statutory authority because it excludes advanced nursing degrees from the definition of "professional degrees" even though those degrees satisfy the OBBBA's statutory definition.

70. Advanced nursing degrees meet the statutory definition of "professional degree." The OBBBA adopted the Department's pre-existing regulatory definition of "professional degree" as of the date of the statute's enactment. That regulation contains a three-part test, which advanced nursing degrees meet. Those degrees are all at the post-baccalaureate level and prepare students to enter APRN professions,

21

which are separate and distinct professions from associate or baccalaureate-prepared nursing. Professional licensure is also required for advanced nursing practice and granted by licensing boards after a student has graduated from an accredited advanced nursing program.

71.   In the Final Rule, the Department expressly recognized that MSN, DNP, and DNAP degrees all appear to meet the "operative" three-part test adopted by the OBBBA because they signify "completion of the academic requirements for beginning practice in a given profession," the professions that graduates "enter require a level of professional skill beyond what is normally required for a bachelor's degree," and the professions "generally require professional licensure, or [graduates] must obtain additional authorization to begin practicing in all States." 91 Fed. Reg. at 23795, 23797, 23798.

72.   The Department had no statutory authority to disqualify advanced nursing degrees from the definition in the statute based on the "contextual clues" that the Department claimed to find in the statute's non-exhaustive list of examples. The Act's three-part test is followed by an exemplary list of professional degrees that "include but are not limited" to the listed examples. Congress did not authorize the Department to identify "contextual signs" from that illustrative list and convert those "clues" into a set of additional mandatory requirements, as the Department did in the Final Rule. Indeed, the scope of examples in the illustrative list underscores that a variety of degrees meet the statutory criteria. The list contains professions from doctors and dentists to veterinarians, lawyers, and pastors.

73.   The Department has no authority, for example, to exclude advanced nursing degrees based on the Department's determination that APRNs are supervised by another professional under certain state laws, a requirement that appears nowhere in the Act's definition and bears no relation to the Act's definition. The Department also lacks authority to exclude advanced nursing degrees based on

22

non-statutory factors such as whether the degree is at the master's rather than the doctoral level, the length of study, or whether it leads to the same professions as a degree at a different credential level.

74. The Final Rule is also unlawful because it is arbitrary and capricious and is not the product of reasoned decision-making.

75. In excluding advanced nursing degrees from the definition of "professional degree," the Department arbitrarily relied on factors that Congress did not intend it to consider, such as the fact that any state imposes supervision restrictions on APRNs. *See* 91 Fed. Reg. at 23797. The Final Rule also relied on the fact that the MSN, for example, is not at the "doctoral level," but the Final Rule acknowledges that "three non-doctoral degrees" are included in the Act's "illustrative list" of professional degrees, and thus the statutory definition is not limited to doctoral degrees. 91 Fed. Reg. at 23796; *id.* at 23784 ("The list shows that the incorporated framework is not categorically limited to doctoral degrees.").

76. The Department's stated reasons for excluding advanced nursing degrees are also inconsistent, counter to the evidence, and unsupported by the rulemaking record. For example, in excluding advanced nursing degrees, the Final Rule states that the Department found it "determinative" that "any State" requires supervision of APRNs by physicians, *id.* at 23797, but the Final Rule elsewhere explains that the Department "does not agree that variation in State supervision and practice-authority is relevant to determining whether a program may be considered a professional degree," *id.* at 23787.

77. The Final Rule is also arbitrary and capricious because the Department failed to meaningfully respond to comments that explained why the MSN, DNP, DNAP, and Nursing PhD meet the statutory criteria and why the Department's rule would have a devastating effect on nursing practice, including in rural and underserved areas. The Department failed to meaningfully respond to comments, for

23

example, that explained why state scope-of-practice requirements have no bearing on the statutory criteria, including because agencies under President Trump's leadership have recognized that state scope-of-practice requirements are unrelated to nurses' education, skill, or training.

78.     The Department also failed to consider important aspects of the problem, including the disruptive consequences its interpretation will have on students' ability to obtain advanced nursing degrees. Commenters explained, for example, that the average cost of graduate nursing education exceeds the statutory loan limit, but the Department erroneously suggested that "95 percent" of nursing students borrow below the annual loan limit, using figures which appear to include undergraduate degrees. *Id.* at 23817. The Department also mistakenly concluded that it was "not relevant" to and "had no bearing on" its analysis that advanced nursing programs are inherently costly because of the equipment and training required, or that the lower loan limit will inhibit and deter individuals from pursuing advanced nursing degrees and harm our Nation's healthcare system. *Id.* at 23795.

### G.     The Final Rule Will Harm Plaintiffs and Their Members

79.     The Final Rule's exclusion of advanced nursing degrees from the definition of "professional degrees" will concretely and imminently harm plaintiffs and their members.

80.     Under the Final Rule, students seeking advanced nursing degrees will be limited to borrowing $20,500 annually ($100,000 in aggregate), which is $29,500 less per year than if the degrees were correctly categorized as professional degrees and subject to the higher $50,000 annual limit ($200,000 in aggregate). 20 U.S.C. § 1087e(a)(4).

81.     That difference is significant for students aspiring to graduate nursing degrees, which typically cost more per year than the $20,500 limit. For example, the tuition and fees alone for in-state students pursuing a DNP in nurse anesthesia at

24

the University of Tennessee-Knoxville is over $30,000 per year for two years of the program, and more than $100,000 total.[11] And the total program cost for in-state students at West Virginia University is more than $144,000 for the DNP nurse anesthetist program.[12] A survey from the American Association of Colleges of Nursing, for example, shows that graduate nursing education averages more than $38,000 per year based on the 1,713 graduate nursing students from across 330 schools who responded to the survey.[13]

82.    Students pursuing advanced nursing degrees frequently borrow higher loan amounts not only for education, but also to cover other basic living needs during enrollment, such as housing, transportation, healthcare, utilities, and food. This financial assistance is often particularly necessary for students pursuing advanced nursing degrees because students must maintain a full course load while also completing unpaid clinical hours.

83.    Additional factors contribute to high program costs for advanced nursing degrees. For example, not every state has a college or university that offers a Certified Registered Nurse Anesthetist program. Students pursuing a degree in that field therefore may not have the option to attend an in-state institution, where tuition may be lower. The difference between in-state and out-of-state tuition can be significant. And for several schools, the in-state cost to obtain a DNP exceeds the

---

[11] *See* The University of Tennessee Knoxville, *Graduate Tuition & Fees* (last visited May 28, 2026), https://nursing.utk.edu/graduate-tuition-and-fees/.

[12] *See* West Virginia University School of Nursing, *DNP Nurse Anesthetist Program Student Handbook*, 57 (Aug. 1, 2025), https://nursing.hsc.wvu.edu/media/75215/2025-2026_nap-handbook_clean_final_2025-july.pdf; *see also* All CRNA Schools, *CRNA Schools by State* (last visited May 28, 2026), https://www.all-crna-schools.com/nurse-anesthesia-crna-schools-by-state/2/.

[13] American Association of Colleges of Nursing, *AACN 2025 Survey of Deans on Impact of Proposed Loan Limits: Assessing the Impact of Federal Loan Limits on Post-Baccalaureate Nursing Education: Perspectives from Deans and Students* (Dec. 2025), https://www.aacnnursing.org/Portals/0/PDFs/Data/AACN-Data-Loan-Cap-Survey-Report-December-2025.pdf.

Final Rule's loan limits. At Northeastern University, for example, the total cost for the nurse anesthetist program is over $149,000, which exceeds the $100,000 aggregate borrowing limit under the Final Rule.[14] As AANA explained in its comment letter, these programs include significant costs for purchasing "cutting edge equipment for training," "malpractice insurance," and "administrative support to ensure clinical training sites and contracts."

84.     The Department recognized in its NPRM that nurse anesthetists have an average of $49,045 in annual loan disbursements. 91 Fed. Reg. at 4316, tbl. 5.3. The NPRM also recognized that 45.2% of borrowers for nurse anesthetist degrees have annual loan disbursements above $50,000. *Id.*; *see also* 91 Fed. Reg. at 23852 (noting in Final Rule data from 2023-2024 showing a substantial portion of borrowers for graduate nurse anesthetist programs borrowing above the annual loan limit).

85.     Students wishing to pursue advanced nursing degrees that need financial assistance above the $20,500 loan cap (or $100,000 aggregate limit) to cover the cost of attendance will need to obtain private loans or other sources of financing.

86.     Private loans are more expensive than federal loans and lack important benefits and advantages of federal loans. Private loans typically carry higher interest rates than federal loans, which make repayment more expensive. Unlike federal loans, private loans also often lack deferment options that allow graduates time to secure employment before payments are due. Repayment options for private loans are likely to be more limited and less flexible compared to federal loans. And private loans are also not eligible for all federal loan forgiveness programs.

---

[14] Northeastern University, *Doctor of Nursing Practice - Nurse Anesthesia* (last visited May 29, 2026), https://graduate.northeastern.edu/programs/dnp-nurse-anes-thesia/doctor-of-nursing-practice-nurse-anesthesia-boston/.

87.    Private loans may also be more difficult to obtain for some students than federal loans because private lenders often require an established credit record or a cosigner.

88.    The Department recognized in the Final Rule that students may need to obtain private loans, which "may have less favorable terms than Federal student loans," and "some students . . . may not be able to secure non-Federal loans to replace the borrowing capacity lost under" the lower borrowing limits, and that some students "may have to drop out of their program due to their inability to afford" the program or "reconsider their enrollment and financing decisions." 91 Fed. Reg. at 23856.

89.    Under the Final Rule, members of plaintiff associations who plan to pursue advanced nursing degrees but who need financial assistance will either need to obtain higher-cost private loans to cover the cost of attendance, or else delay or forgo their pursuit of a graduate education.

90.    Members of plaintiff associations plan to attend post-baccalaureate nursing programs. Prior to the Final Rule, members of plaintiff associations planned to rely on federal loans to finance these programs. To afford tuition, costs, and other expenses, members of plaintiff associations would need to borrow above $20,500 per year or $100,000 aggregate limit under the Final Rule.

91.    Because of the new loan limits under the Final Rule, members of plaintiff associations who planned to enroll in post-baccalaureate nursing programs are now forced to change their plans and forgo or delay enrollment in their desired program because of the inability to finance their education through federal loans.

92.    Because of the new loan limits under the Final Rule, members of plaintiff associations who plan to enroll in post-baccalaureate nursing programs will now need to finance their education through less favorable forms of financial assistance, including private loans that are more expensive than federal loans,

subject to less flexible repayment options, and not eligible for public service loan forgiveness.

93.    One of ANA's members, Teshieka K. Curtis-Pugh, is a registered nurse and the Executive Director of the South Carolina Nurses Association who plans to pursue a PhD in global health equity. Because Ms. Curtis-Pugh works full time and has significant family financial obligations, the Final Rule's lower loan limits are a determinative factor in whether she can afford to return to school; without sufficient federal loan support, she will have to delay her doctorate, seek higher-interest private loans, or forgo the degree altogether.

94.    One of AANA's members, Leandra C. Vance, is currently a registered nurse at INOVA Fairfax Cardiovascular Intensive Care Unit, who plans to apply next year to a nurse anesthesia program—which are required to be doctoral level programs—so that she can become a certified registered nurse anesthetist (CRNA), and she has already taken several significant steps to prepare to enter a doctoral nurse anesthesia program. Because the Final Rule's loan limits would not cover the tuition and living expenses necessary for her to attend the local programs available to her, Mrs. Vance is now forced to consider delaying her application, limiting where she applies, or relying on more expensive private loans that may impose an unsustainable financial burden on her and her family.

95.    The Final Rule also limits opportunities and causes significant uncertainty for plaintiffs' members who have already borrowed federal funds and are currently pursuing an advanced nursing degree. Under the Act, students who have borrowed funds and are attending a program as of June 30, 2026, are not subject to the lower borrowing limits. But the Final Rule provides that this interim exception does not apply if a student withdraws or transfers, including if a student transfers to the same program of study at a different institution. Students currently pursuing advanced nursing degrees, which can last up to 4 years, thus lack the opportunity to

transfer to a different institution without the consequence of losing access to a higher borrowing limit that may make financing their education possible.

96. The Final Rule also injures plaintiffs as organizations.

97. As part of its mission, plaintiff ANA has worked to address the nation's nurse staffing crisis through education, advocacy, and professional resources to advance the nursing profession and improve the quality of healthcare. The Final Rule's exclusion of advanced nursing degrees from higher loan limits will deter and inhibit students from becoming APRNs, which will exacerbate existing nursing shortages. Excluding advanced nursing degrees from higher loan limits will make it harder for students to obtain the advanced degrees that are necessary to teach the next generation of nurses at the associate and bachelor's level. It is critical that nurses are trained by faculty with appropriate advanced degrees, and nursing faculty are generally required to hold at least a master's degree to teach. Faculty vacancies in nursing programs are already limiting capacity for programs nationwide, placing a strain on the profession. The Final Rule's loan limits for advanced nursing degrees will significantly worsen existing faculty shortages, restrict student enrollment, and undermine critical workforce expansion efforts, impeding ANA's ability to accomplish its mission. Advanced nursing degrees are necessary for the development and administration of accredited continuing nursing education programs. By excluding advanced nursing degrees from higher loan limits, the Final Rule will reduce access to programs that are critical to the continued development of nurses and advancing the nursing profession. For example, this could reduce the number of fellows entering high need specialties such as primary care, behavioral health, emergency medicine, and rural health, ultimately worsening workforce shortages and limiting access to care. The effectiveness of these programs depends on a strong pipeline of APRN graduates. The Final Rule will undermine the sustainability and impact of these essential workforce development programs, requiring ANA to spend resources to

29

educate its members and otherwise address the gaps left by these weakened programs.

98.    As part of its mission, ANA and its affiliates also provide educational materials and resources to help members obtain and renew certification in advanced practice roles, including *Code of Ethics for Nurses* and *Nursing: Scope and Standards of Practice*.  By inhibiting and deterring students from pursuing advanced nursing degrees, the Final Rule will harm ANA by having fewer nurses with advanced degrees to contribute to these publications, as well as fewer members who will purchase educational materials, books, and courses to prepare for their certification examinations.

99.    Moreover, as the professional organization representing the interests of the nation's 5 million registered nurses, ANA will need to devote significant organizational resources to respond to member concerns about the Final Rule and educate its members about the Final Rule's impacts, including through training, webinars, and other materials addressing the changed loan limits and what they mean for advanced nursing students.

100.    Plaintiff AANA will likewise be harmed as an organization. AANA's mission is to advance the nurse anesthesiology profession and improve patient care through advocacy, education, research, and practice resources. The Final Rule's exclusion of advanced nursing degrees from higher borrowing limits impairs this mission, as fewer nurses will be able to afford the graduate education necessary to become certified registered nurse anesthetists, reducing entry into the profession and disrupting the delivery of care, particularly in rural areas in which nurse anesthetists are often the primary provider of anesthesia. Moreover, as fewer nurses receive graduate education, fewer faculty will be available to educate and train the next generation of nurse anesthetists, further widening this gap in care. AANA will also suffer a reduction in members and membership dues as a result of the decline of

students pursuing advanced degrees for nurse anesthesiology. AANA will also have to spend significant organizational resources to educate its members about the Final Rule and respond to member concerns, including through providing resources to its members and educating them on the Final Rule's impacts. AANA is spending considerable resources surveying impacted members and the educational funding landscape to provide accurate information for its membership. This is in addition to the public relations, member educational, and member engagement support AANA has spent throughout the negotiated rulemaking and proposed rulemaking process.

101.    Plaintiff NPWH will also be harmed by the Final Rule. NPWH's mission is to advance the role of women's health nurse practitioners and other APRNs specializing in women's healthcare through education, advocacy, clinical guidance, and professional resources. The Final Rule's exclusion of advanced nursing degrees from higher borrowing limits will impair that mission by deterring nurses from pursuing the graduate education necessary to become women's health nurse practitioners and other APRNs, reducing access to women's healthcare and limiting the number of qualified faculty available to educate the next generation. The Final Rule will also reduce NPWH's prospective membership and dues and require NPWH to expend organizational resources to educate members about the Final Rule and respond to member concerns, including through member communications, guidance, webinars, and other resources.

102.    The Final Rule will also harm plaintiff NACNS. NACNS's mission is to advocate for and advance the unique expertise and values that clinical nurse specialists provide and to reduce the cost of healthcare delivery. Through NACNS's Novice to Exceptional Transformational (N.E.X.T.) "Next Generation" initiative, student nurses and those nurses who are transitioning to practice rely on NACNS to guide their professional development, assist in networking for employment, and secure necessary continuing educational opportunities for patient-centered care.

Under the Final Rule, fewer students will be able to afford the graduate education required to become a clinical nurse specialist, which will restrict the pool of potential graduate school nurse applicants, lead to closures in specialized nursing programs, and curtail faculty and educators teaching tomorrow's nurses. The Final Rule will also decrease NACNS's membership and membership dues as fewer nurses become clinical nurse specialists. NACNS will need to expend significant organizational resources to mitigate the harmful impact of the Final Rule and educate its membership on the final rule, including the deleterious effects on the nursing field, direct patient care, and quality outcome measures.

103.    Plaintiff ACNM will also be harmed by the Final Rule, which will decrease the number of nurses enrolling in graduate education necessary to become a certified nurse-midwife, reducing ACNM's membership and the dues that it collects. By reducing the number of students pursuing advanced degrees for certified nurse midwifery, the Final Rule will also exacerbate an ongoing shortage of maternal healthcare providers in the United States, impeding ACNM's mission to promote, protect, and advance the practice of midwifery and the communities they serve. ACNM will also have to devote significant organizational resources in response to the Final Rule, including to educate its members and respond to member questions about the Final Rule's impact.

104.    Plaintiff AHNA will also be harmed by the Final Rule. AHNA's mission is to advance holistic nursing through practice, community, advocacy, research, and education. By excluding advanced nursing degrees from higher borrowing limits, the Final Rule will deter nurses from pursuing graduate education needed for advanced practice, education, research, and leadership in holistic nursing, frustrating AHNA's mission and reducing the number of qualified nurses available to teach and advance holistic nursing practice. The Final Rule will also reduce AHNA's prospective membership and dues and force AHNA to devote organizational resources to

32

educating members and prospective members about the Final Rule's effects, including through communications, programming, and member resources.

105. Plaintiff APHON will likewise be harmed as an organization. APHON's mission is to support and advance pediatric hematology/oncology nurses in optimizing outcomes for children, adolescents, young adults, and families facing blood disorders and cancers. The Final Rule's exclusion of advanced nursing degrees from higher borrowing limits will impair that mission by deterring nurses from pursuing graduate education needed for advanced clinical practice, research, leadership, and faculty roles in this highly specialized field. The Final Rule will also reduce APHON's prospective membership and dues and require APHON to expend organizational resources to educate members about the Final Rule and respond to member concerns, including through guidance, member communications, webinars, and other resources.

106. Plaintiff AWHONN will likewise be harmed as an organization. AWHONN's mission is to empower and support nurses caring for women, newborns, and families through research, education, and advocacy. The Final Rule's exclusion of advanced nursing degrees from higher borrowing limits will impair that mission by deterring nurses from pursuing graduate education necessary for advanced clinical practice, nursing education, research, and leadership in women's health, obstetric, and neonatal nursing. The Final Rule will also reduce AWHONN's prospective membership and dues and require AWHONN to spend significant organizational resources educating members about the Final Rule, responding to member concerns, and developing member communications, webinars, and other resources.

107. Plaintiff Chi Eta Phi will also be harmed by the Final Rule. Chi Eta Phi is a professional organization of registered nurses and nursing students whose mission includes elevating the nursing profession, encouraging continuing education,

33

developing nursing leaders, and increasing interest in nursing and health careers. The Final Rule's exclusion of advanced nursing degrees from higher borrowing limits will frustrate that mission by deterring nurses and nursing students from pursuing graduate education necessary for advanced practice, nursing education, research, and leadership. The Final Rule will also reduce Chi Eta Phi's prospective membership and dues and require Chi Eta Phi to devote organizational resources to educating members and student members about the Final Rule and its impact on advanced nursing education.

108.    Plaintiff HMA will also be harmed by the Final Rule. HMA's mission is to encourage, support, and empower faith community nurses, health ministers, clergy, chaplains, faculty, and program leaders who integrate faith and health in local communities. The Final Rule's exclusion of advanced nursing degrees from higher borrowing limits will impair that mission by deterring nurses from pursuing graduate education needed for leadership, education, community health, and faith community nursing roles. The Final Rule will also reduce HMA's prospective membership and dues and require HMA to expend organizational resources to educate members about the Final Rule's effects, respond to member concerns, and prepare communications, programming, and other resources.

109.    Plaintiff NRHA will likewise be harmed by the Final Rule. Its mission is to improve the health and well-being of rural Americans and their communities through advocacy, communications, education, and research. The Final Rule's exclusion of advanced nursing degrees from higher borrowing limits will undermine that mission by deterring students from pursuing advanced nursing degrees at a time when rural areas are facing a shortage of health-care providers and depend on advanced practice nurses to provide care. The Final Rule will also reduce NRHA's prospective membership dues and require it to spend significant resources educating members about the Final Rule and responding to member concerns. It will further

34

hinder NRHA's ability to fulfill grant terms, sell educational materials and event registrations, and offer ongoing programmatic activities.

## COUNT I

### Violation of the Administrative Procedure Act:
### Contrary to Law and in Excess of Statutory Authority

1. Plaintiffs reallege all allegations contained in the preceding paragraphs and incorporate them herein by reference.

2. The APA prohibits the Department from acting contrary to law or in excess of statutory authority. 5 U.S.C. § 706(2)(C).

3. The Final Rule's exclusion of advanced nursing degrees from the definition of "professional degree" is contrary to law and exceeds the Department's statutory authority.

4. Congress incorporated the agency's pre-existing regulatory definition of "professional degree" into the OBBBA. The Department's exclusion of advanced nursing degrees from its regulatory definition is contrary to law, and the Department lacks statutory authority to exclude advanced nursing degrees from that definition based on the extra-statutory criteria adopted by the Department.

5. For the foregoing reasons, the Final Rule exceeds the Department's statutory authority and is contrary to law, and the Court must declare it unlawful and set it aside.

## COUNT II

### Violation of the Administrative Procedure Act:
### Arbitrary and Capricious

6. Plaintiffs reallege all allegations contained in the preceding paragraphs and incorporate them herein by reference.

7.     The APA prohibits the Department from acting in a manner that is arbitrary or capricious or not otherwise in accordance with law. 5 U.S.C. § 706(2)(A).

8.     The Department's decision to exclude advanced nursing degrees from the definition of "professional degree" is arbitrary and capricious for several reasons, including because the Department relied on criteria that are unauthorized and unsupported by the evidence. The Department's stated reasons for excluding advanced nursing degrees are also arbitrary and internally inconsistent.

9.     The Department also failed to meaningfully engage with comments submitted in response to the NPRM, including numerous comments explaining why advanced nursing degrees satisfy the statutory criteria and why the Department's stated basis for excluding nurses is not permissible and not based on evidence.

10.     The Department also failed to consider important parts of the problem, including the extent to which the Final Rule will make it harder for students to obtain advanced nursing degrees and the devastating impact that will have on the nursing profession, the economy, and our nation's healthcare system.

11.     For the foregoing reasons, the Final Rule is arbitrary and capricious in excluding advanced nursing degrees from the definition of "professional degree" and the Court must declare it unlawful and set it aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A. Declare that the Final Rule's definition of "professional degree" is contrary to law and arbitrary and capricious to the extent it excludes advanced nursing degrees.

B. Stay the effective date of the challenged portion of the Final Rule under 5 U.S.C. § 705.

C. Preliminarily and permanently enjoin the Department from relying on or enforcing the new definition of "professional degree," 91 Fed. Reg. at 23882-83 (to be codified at 34 C.F.R. § 685.102(b)), with respect to students pursuing advanced nursing degrees.

D.  Vacate and set aside the Final Rule's definition of "professional degree" under 5 U.S.C. § 706.

E. Award Plaintiffs their reasonable costs, fees, and expenses, including attorneys' fees.

F. Award any other relief as this Court may deem just and proper.

Dated: June 15, 2026                          Respectfully submitted,


                                              /s/ *Megan Barbero*
                                              Megan Barbero (MA Bar No. 668854)
                                              Jay C. Johnson
                                              Courtney L. Dixon
                                              Kyle H. Keraga
                                              Elizabeth M. Wilson
                                              600 Massachusetts Avenue, N.W.
                                              Washington, DC 20001
                                              Phone: 202-344-4000
                                              Fax: 202-344-8300
                                              mbarbero@venable.com

                                              *Counsel for Plaintiffs Nurses Associations*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2026, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

/s/ *Megan Barbero*
Megan Barbero