**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
AMERICAN NURSES ASSOCIATION;            )
AMERICAN ASSOCIATION OF NURSE           )
ANESTHESIOLOGY; NATIONAL                )
ASSOCIATION OF NURSE PRACTITIONERS      )
IN WOMEN'S HEALTH; NATIONAL             )
ASSOCIATION OF CLINICAL NURSE           )
SPECIALISTS; AMERICAN COLLEGE OF        )
NURSE-MIDWIVES; AMERICAN HOLISTIC       )
NURSES ASSOCIATION; ASSOCIATION OF      )
PEDIATRIC HEMATOLOGY/ONCOLOGY           )
NURSES; ASSOCIATION OF WOMEN'S          )
HEALTH, OBSTETRIC AND NEONATAL          )    Civil Action
NURSES; CHI ETA PHI SORORITY,           )    No. 26-cv-12443-PBS
INC.; HEALTH MINISTRIES                 )
ASSOCIATION; and NATIONAL RURAL         )
HEALTH ASSOCIATION,                     )
                                        )
              Plaintiffs,               )
                                        )
v.                                      )
                                        )
UNITED STATES DEPARTMENT OF             )
EDUCATION and LINDA MCMAHON, in         )
her official capacity as United         )
States Secretary of Education,          )
                                        )
              Defendants.               )
_____)

**MEMORANDUM AND ORDER**

August 10, 2026

Saris, J.

**INTRODUCTION**

In July 2025, Congress enacted the One Big Beautiful Bill Act

(the "OBBBA"). See Pub. L. No. 119-21, 139 Stat. 72 (2025). Among

many other provisions, the OBBBA made significant changes to the

1

federal student loan system for graduate-level students. Previously, a graduate-level student could borrow (1) Direct Unsubsidized Loans up to an annual and aggregate limit and (2) Direct PLUS Loans to cover the remainder of the full cost of attendance for his or her program. The OBBBA eliminated the uncapped Direct PLUS Loans and established new limits on the amount of Direct Unsubsidized Loans graduate-level students may borrow. These new limits on Direct Unsubsidized Loans, which came into effect on July 1, 2026, differ depending on the type of degree program in which a student is enrolled: a "graduate student" enrolled in a "graduate degree" program may only borrow a maximum of $20,500 per year and $100,000 in aggregate, while a "professional student" in a "professional degree" program may borrow up to $50,000 per year and $200,000 in aggregate. 20 U.S.C. § 1087e(a)(4)(A)-(B). A graduate-level student thus may borrow significantly more in federal student loans if his or her program is classified as awarding a "professional degree" rather than a "graduate degree." Congress, in turn, defined "professional degree" by incorporating the definition of the term then in effect in 34 C.F.R. § 668.2. See id. § 1087e(a)(4)(C)(ii).

On May 1, 2026, the U.S. Department of Education (the "Department") promulgated a final rule to implement these new loan caps for graduate-level students and other changes to the federal student loan program in the OBBBA. See Reimagining and Improving

Student Education -- Federal Student Loan Program Final Regulations, 91 Fed. Reg. 23768, 23768 (May 1, 2026) (the "Final Rule"). The Final Rule, which also went into effect on July 1, 2026, included its own definitions of "professional student" and "professional degree" that added certain requirements beyond those expressly laid out in the regulatory definition Congress incorporated into the OBBBA. The Final Rule further provided that only the following degrees qualify as "professional" for purposes of the OBBBA's loan limits: "Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.)." Id. at 23882. All other graduate-level degrees are subject to the lower loan limits for "graduate" degrees.

Soon after issuance of the Final Rule, Plaintiffs, various not-for-profit organizations that represent the interests of nurses, filed this lawsuit against the Department and U.S. Secretary of Education Linda McMahon (together, "Defendants"). Plaintiffs allege that the Final Rule is contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., insofar as it excludes graduate-level degrees that train students to become nurse practitioners ("NPs"), clinical nurse specialists ("CNSs"),

certified nurse midwifes ("CNMs"), and certified registered nurse anesthetists ("CRNAs") from the definition of "professional degree" and, thus, from the higher loan limits under the OBBBA. These degrees are the Master of Science in Nursing ("MSN"), the Doctor of Nursing Practice ("DNP"), the Doctor of Nursing Anesthesia Practice ("DNAP"), and the Doctor of Philosophy ("PhD") in Nursing. Plaintiffs promptly moved for both a preliminary injunction barring Defendants from relying on or enforcing the Final Rule's exclusion of these advanced nursing degrees from the definition of "professional degree" and from the higher loan limits and a postponement of the effective date of that aspect of the Final Rule pending judicial review under 5 U.S.C. § 705.

After a hearing, the Court concludes that Plaintiffs are likely to succeed in showing that the Final Rule's definitions of "professional student" and "professional degree" are contrary to law. Those definitions include multiple requirements for a degree to qualify as "professional" that contravene the unambiguous three-part regulatory test incorporated into the OBBBA.

Since the filing of Plaintiffs' motion, a federal district court in the District of Columbia has already issued a well-reasoned opinion postponing the effective date of the Final Rule's definition of "professional degree" under § 705, see Am. Ass'n of Nurse Pracs. v. McMahon ("AANP"), __ F. Supp. 3d __, __ (D.D.C. 2026) [2026 WL 1826176, at *24], and the Department has issued

guidance providing that, while the AANP court's postponement order remains in effect, it will treat MSN, DNAP, and DNP students as "professional" students for purposes of the OBBBA's loan caps. Because this guidance currently alleviates any irreparable harm that MSN, DNAP, and DNP students may face from the Final Rule's definitions of "professional student" and "professional degree," preliminary relief is not warranted with respect to such students. And while the guidance does not provide that the Department will treat PhDs in Nursing as "professional" degrees, the record now before the Court does not support a finding that either Plaintiffs or any of their members likely will face irreparable harm specifically from the Final Rule's classification of PhDs in Nursing as "graduate" degrees.

Accordingly, the Court **DENIES** without prejudice Plaintiffs' motion for preliminary injunction and a stay (Dkt. 14).

## BACKGROUND

The Court draws the following facts from Plaintiffs' amended complaint and the uncontroverted declarations submitted by Plaintiffs in support of their motion. See Doe v. Trump, 157 F.4th 36, 47 (1st Cir. 2025), cert. denied, __ S. Ct. __ (2026) [2026 WL 1871309]. The Court includes a glossary of relevant acronyms at the end of this opinion.

## I.   Advanced Practice Registered Nurses

Advanced practice registered nurses ("APRNs") are registered

nurses who have received a master's degree or higher, have passed a national certification examination, and are licensed in an advanced practice field. The National Council of State Boards of Nursing recognizes four APRN occupations: CNM, CRNA, CNS, and NP. CNMs provide gynecological and reproductive care during pregnancy and via routine visits, including performing procedures and prescribing medication. CRNAs administer anesthetics during surgical, therapeutic, and other procedures. CNSs provide primary care services and manage acute and chronic illnesses, often for at-risk patients and populations. And NPs provide primary, acute, and specialty care in hospitals, emergency rooms, and physicians' offices, such as prescribing medication and performing procedures.

The degrees that prepare students to practice as an APRN include the MSN, DNP, DNAP, and PhD in Nursing. MSN, DNP, and DNAP programs involve graduate-level coursework in advanced physiology, pathophysiology, health assessment, and pharmacology and at least 500 hours of post-baccalaureate clinical training. A CRNA must complete a DNP in nurse anesthesia or a DNAP, both of which require a minimum of 2,000 hours of clinical training. Students pursuing PhDs in Nursing usually already hold an MSN and take doctoral-level coursework to train them to become leaders and educators in the field. Full-time MSN programs generally take two or three years to finish, while full-time doctoral-level programs last three to five years. These programs cost on average more than $38,000 per

year. Students taking out federal loans for nurse anesthesia degrees borrow on average over $49,000 per year, and the total cost of certain DNP in nurse anesthesia programs exceed $100,000. More than one-fourth of APRNs with loans carry balances above $100,000.

## II.   Federal Student Loans for Graduate-Level Students

Congress enacted the Higher Education Act of 1965 (the "HEA") "to increase educational opportunities and 'assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education.'" Biden v. Nebraska, 600 U.S. 477, 483-84 (2023) (alteration in original) (quoting 20 U.S.C. § 1070(a)); see Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219, 1219 (listing the HEA's purposes as "strengthen[ing] the educational resources of [the country's] colleges and universities and . . . provid[ing] financial assistance for students in postsecondary and higher education"). To further these goals, the HEA established a program for issuing federal student loans. See Biden, 600 U.S. at 484. Under the current federal student loan system -- the William D. Ford Federal Direct Loan Program -- the federal government loans money "directly to students . . . funded by the federal fisc." Id.; see Lawson-Ross v. Great Lakes Higher Educ. Corp., 955 F.3d 908, 911 (11th Cir. 2020). This program "'is the single largest source of federal financial assistance' for postsecondary education." AANP, __ F.

Supp. 3d at __ [2026 WL 1826176, at *2] (quoting Alexandra Hegji, Cong. Rsch. Serv., R45931, Federal Student Loans Made Through the William D. Ford Federal Direct Loan Program: Terms and Conditions for Borrowers 1 (2024), https://www.congress.gov/crs-product/R45931).

Prior to the OBBBA, students enrolled in graduate-level degree programs were eligible for two types of federal student loans: (1) Direct Unsubsidized Loans and (2) Direct PLUS Loans. See 20 U.S.C. §§ 1078-2(a)(1), 1078-8(b), 1087e(a)(1), (2)(B), (D). The amount of Direct Unsubsidized Loans graduate-level students could borrow was capped. See id. § 1078-8(d)(1)-(2); 34 C.F.R. § 685.203(b)(2)(iii), (e)(3). Such students could, however, also take out Direct PLUS Loans up to the full cost of attendance, see 20 U.S.C. § 1078-2(b); 34 C.F.R. § 685.203(f)(1), (g)(1); Reimagining and Improving Student Education, 91 Fed. Reg. at 23866, albeit at a higher interest rate than the capped Direct Unsubsidized Loans, see AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *3].

In July 2025, Congress enacted the OBBBA, which changed the federal student loan system for graduate-level students. As relevant here, the OBBBA eliminated graduate-level students' eligibility for Direct PLUS Loans for periods of instruction starting on or after July 1, 2026. See OBBBA § 81001(1)(C), 139 Stat. at 334 (codified at 20 U.S.C. § 1087e(a)(3)(C)). The law

8

also set annual and aggregate borrowing limits for Direct Unsubsidized Loans that differ for "graduate" and "professional" students. As of July 1, 2026, a "graduate student" may borrow no more than $20,500 per academic year and $100,000 in total. Id. § 81001(2), 139 Stat. at 334-35 (codified at 20 U.S.C. § 1087e(a)(4)(A)(i), (B)(i)(I)). A "professional student," by contrast, may borrow up to $50,000 per academic year and $200,000 in total. Id. (codified at 20 U.S.C. § 1087e(a)(4)(A)(ii), (B)(ii)(I)). The OBBBA included "a grandfathering provision that exempts from the new loan limits students who have already [received] a federal loan and are 'enrolled in a program of study at an institution of higher education' as of June 30, 2026, for the duration of their 'expected time to credential' (up to a maximum of 'three academic years')." AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *4] (quoting 20 U.S.C. § 1087e(a)(8)); see OBBBA § 81001(2), 139 Stat. at 336-37.

For purposes of these loan limits, the OBBBA defined a "graduate student" as "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." OBBBA § 81001(2), 139 Stat. at 335 (codified at 20 U.S.C. § 1087e(a)(4)(C)(i)). And Congress defined "professional student" as "a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as

in effect on the date of enactment of this paragraph), upon completion of the program." Id. (codified at 20 U.S.C. § 1087e(a)(4)(C)(ii)).

As of July 2025, 34 C.F.R. § 668.2 provided -- and still provides today -- that the term "professional degree" means:

> [a] degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2(b) (2025). This regulatory definition, which the Department drew from the National Center for Educational Statistics ("NCES"), has remained unchanged since it was enacted in 2007. See Federal Student Aid Programs, 72 Fed. Reg. 62014, 62025 (Nov. 1, 2007); Federal Student Aid Programs, 72 Fed. Reg. 44620, 44621 (Aug. 8, 2007).

## III. **Final Rule**

On May 1, 2026, the Department issued the Final Rule to implement the OBBBA's changes to the federal student loan system. See Reimagining and Improving Student Education, 91 Fed. Reg. at 23769. The Final Rule included the annual and aggregate Direct Unsubsidized Loan caps established in the OBBBA for "graduate" and

10

"professional" students starting on July 1, 2026. Id. at 23883 (to be codified at 34 C.F.R. § 685.203(b)(2)(iv)(A), (e)(4)-(5)). To reflect the OBBBA's grandfathering provision, these caps do not apply to "student borrowers during the period of the student's expected time to credential if . . . (1) the student is enrolled in a program of study at an institution as of June 30, 2026; and (2) a Direct Loan was made prior to July 1, 2026, for such a program of study." Id. (to be codified at 34 C.F.R. § 685.203(b)(2)(iv)(B)); see id. (to be codified at 34 C.F.R. § 685.203(e)(6)).

The Final Rule defined a "graduate student" similarly to the OBBBA as a "student enrolled in a program of study that is above the baccalaureate level and awards a graduate credential (other than a professional degree) upon completion of the program." Id. at 23882 (codified at 34 C.F.R. § 685.102(b)). By contrast, the Final Rule's definitions of the terms "professional student" and "professional degree" include requirements that are not expressly laid out in the definitions of those terms in the OBBBA and 34 C.F.R. § 668.2. Under the Final Rule, a "professional student" is:

> [a] student enrolled in a program of study that awards a professional degree upon completion of the program;
>
> (i)   A professional degree is a degree that:
>
>> (A)   Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a

bachelor's degree;

    (B)    Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;

    (C)    Generally requires professional licensure to begin practice; and

    (D)    Includes a four-digit program [Classification of Instructional Programs ("CIP")] code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition.[1]

(ii)    A professional degree may be awarded in the following fields:

    (A)    Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

    (B)    [Reserved]

(iii)    A professional student under this definition:

    (A)    May not receive title IV aid as an undergraduate student for the same period of

---

[1] The CIP "provides a taxonomic scheme that supports the accurate tracking and reporting of fields of study and program completions activity." CIP: The Classification of Instructional Programs, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/ipeds/cipcode/default.aspx?y=56 (last visited Aug. 10, 2026). Every type of program has "an individual code" under the CIP. U.S. Dep't of Homeland Sec., Classification of Instructional Programs, Study in the States (June 4, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/classification-of-instructional-programs-cip.

enrollment; and

(B)    Must be enrolled in a program leading to a professional degree under paragraph (ii) of this definition.

Id. at 23882-83 (footnote added) (codified at 34 C.F.R. § 685.102(b)). The Final Rule also made § 668.2's "illustrative list of qualifying degrees into an exhaustive one," with the addition of doctorate-level degrees in clinical psychology. AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *5].

In the Final Rule, the Department addressed various comments about the definitions of "professional student" and "professional degree" generally and its application to advanced nursing students more specifically. The Department explained that in order to "be considered a professional degree, a degree must meet the three-prong test [incorporated into the OBBBA from § 668.2] and be similar in character to the degrees Congress included in the illustrative list in the definition of professional degree." Reimagining and Improving Student Education, 91 Fed. Reg. at 23785; see id. at 23783 (noting that the Department identified professional degrees by employing both the OBBBA's "operative definition with elements" and "context and limiting principles that are common across all, or substantially all, of the illustrative programs listed in the definition"). In other words, the Department "appl[ied] the incorporated definition [of "professional degree" from § 668.2] as a bounded and uniform

classification informed by the listed examples and the same general class of programs reflected in the enumerated examples." Id. at 23783.

The Department justified its use of "contextual requirements provided by the illustrative list" on the basis that the "noscitur a sociis" canon of construction "require[d] [it] to determine what the enumerated degrees have in common and take that into account when determining whether another degree should be considered a professional degree." Id. at 23789.[2] The Department noted that the canon against surplusage similarly counseled in favor of interpreting the "illustrative list of degrees . . . to have some legal consequence" in "distinguish[ing] professional degrees from graduate degrees." Id.[3] Treating the illustrative list as limiting, the Department continued, also "furthers general policy set forth in the statute to set higher loan limits for a narrow group of programs." Id.

The Department received many comments challenging the exclusion of master's and doctoral degrees for APRNs from the

_____

[2] The "canon of noscitur a sociis teaches that a word is 'given more precise content by the neighboring words with which it is associated." Fischer v. United States, 603 U.S. 480, 487 (2024) (quoting United States v. Williams, 553 U.S. 285, 294 (2008)).

[3] Under the canon against surplusage, courts "read statutes, whenever possible, to give effect to every word and phrase." City of Providence v. Barr, 954 F.3d 23, 37 (1st Cir. 2020) (quoting Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 26 (1st Cir. 2006) (en banc)).

definition of "professional degree." In response, the Department acknowledged that each APRN occupation -- CRNA, CNS, CNM, and NP -- is "a fundamentally distinct profession" and that the MSN, DNP, and DNAP degrees "may satisfy the operative definition's three-part test." Id. at 23788-89. The Department excluded these programs, however, because "they do not satisfy the contextual requirements provided by the illustrative list of advanced degrees included within the definition of professional student." Id. at 23789. Based on that list, for example, the Department "was not persuaded that degrees leading to employment that ordinarily must be supervised by a licensed professional in a different occupation and cannot be performed independently" qualify as "professional." Id. at 23787. The Department noted that all four APRN occupations are subject to physician supervision in at least some states and that any state's supervision mandate is fatal to the classification of any of these advanced nursing degrees as "professional." See id. at 23796-99. In the Department's view, the fact that "any State imposes any restrictions [on independent and unsupervised practice] is determinative because all of the degrees in the illustrative list of professional degrees grant unrestricted ability for holders of those degrees to practice that profession in every State without supervision by a professional licensed in another profession." Id. at 23797. The Department therefore deemed a uniform, nationwide ability to practice independently and

15

unsupervised to be "an implied requirement of professional degrees." Id.

The Department gave additional reasons for not treating MSN and DNP degrees as "professional." The Department noted with respect to the MSN that (1) "the illustrative list suggests that a professional degree must generally be at the doctoral-level" and (2) the illustrative degrees "generally require at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework," which is not always true for MSN programs. Id. at 23796. The Department explained that the DNP "exceeds the minimum credential level required for an individual to begin practice as" an NP, CNM, or CNS, which is an MSN degree. Id. at 23798. The Department found this relevant because, with the exception of the obsolete L.L.B. law degree, "for each profession with multiple degrees included in the illustrative list of professional degrees, the degrees leading to employment in that profession are at the same credential level." Id. Relatedly, the Department noted that treating a DNP as a professional degree when it leads to the same employment as an MSN "could be interpreted as the Department's endorsement of one degree over another and could encourage students to pursue a DNP instead of an MSN solely because of the higher loan limits available to professional students." Id.

Finally, the Department made clear that it did not consider

16

factors such as "nursing programs' cost," their "academic rigor," "the importance of nursing in society," and concerns about "the pipeline of advanced practice nurses and [CRNAs]" to be relevant considerations under the OBBBA's definitions of "professional student" and "professional degree." Id. at 23795. Nonetheless, the Department reported "that greater than 95 percent of total Federal loan borrowers in 2023-2024 for nursing Masters, Doctoral, and Professional programs borrowed below the annual limit" set for graduate students in the OBBBA, although the remaining five percent were "disproportionately nurse anesthetist students." Id. at 23817. The data the Department cited in support of this calculation include undergraduate programs. See id. at 23852.

## IV.  **Procedural History and Recent Developments**

On May 29, 2026, Plaintiffs filed this lawsuit challenging the Final Rule's definitions of "professional student" and "professional degree" and the resulting exclusion of advanced nursing students from the OBBBA's higher loan caps for "professional" students. Plaintiffs promptly moved for a preliminary injunction and postponement of the effective date of this aspect of the Final Rule under 5 U.S.C. § 705.

Two relevant events have occurred since Plaintiffs moved for preliminary relief. First, on June 24, 2026, a federal district court in the District of Columbia issued an order under § 705 postponing the effective date of the Final Rule's definition of

17

"professional degree," specifically "part (i) of the [definition in the Final] Rule and the additional free-from-supervision requirement in the preamble to the [Final] Rule." AAANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *24]. Second, in response to that order, the Department issued guidance listing the programs it would treat as awarding "professional" degrees for purposes of the OBBBA's loan caps during the pendency of the postponement. Included on the list are the following CIP codes, titles, and degrees: (1) "51.3801 . . . Registered Nursing/Registered Nurse (MSN)," (2) "51.3804 . . . Nurse Anesthetist (DNAP)," and (3) 51.3818 . . . Nursing Practice (DNP)." Dkt. 53-1 at 3. The guidance states that a "program[] must award the degree in parentheses to qualify" as a "professional" degree program. Id. at 2. In an updated guidance, the Department clarified that it would treat as awarding "professional" degrees any program that awards an MSN, DNP, or DNAP and has a four-digit CIP code of "51.38."

## LEGAL STANDARD

Plaintiffs seek both a preliminary injunction and postponement of the effective date of agency action under 5 U.S.C. § 705. Courts apply the same four-part test to determine whether to issue either form of interim relief. See Nat'l TPS All. v. Noem, 150 F.4th 1000, 1015 (9th Cir. 2025); Cook County v. Wolf, 962 F.3d 208, 221 (7th Cir. 2020); Massachusetts v. Dep't of Educ., __ F. Supp. 3d __, __ (D. Mass. 2026) [2026 WL 1114877, at *7]; Ass'n

of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143, 164 (D. Mass. 2025).

Under this test, "a district court must consider four factors: (1) 'the movant's likelihood of success on the merits,' (2) 'whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief,' (3) 'the balance of relative hardships,' and (4) "the effect, if any, that an injunction or the lack of one may have on the public interest.'" Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 77 (1st Cir. 2025) (quoting Russomano v. Novo Nordisk Inc., 960 F.3d 48, 52 (1st Cir. 2020)). The movant "bears the burden of establishing that these four factors weigh in its favor." Id. (quoting Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006)). The movant's likelihood of success on the merits "weighs most heavily in the" analysis. Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 5 (1st Cir. 2022) (quoting Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020)); see US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 348 (1st Cir. 2024) ("If the movant 'cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" (quoting Ryan, 974 F.3d at 18)). The third and fourth factors -- the balance of hardships and public interest -- "merge when the [g]overnment is the opposing party." Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (alteration in

19

original) (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)).

**DISCUSSION**

**I.   Likelihood of Success on the Merits**

The Court first addresses Plaintiffs' likelihood of success on the merits. In addressing this factor, the Court begins with Defendants' challenge to Plaintiffs' Article III standing to bring this action and then turns to the merits of Plaintiffs' APA claims.

**A.   Article III Standing**

Defendants contend that Plaintiffs have failed to show that they are likely to establish Article III standing to bring this action. The Court lays out the relevant legal standard for establishing standing before applying that standard to the record in this case.

*1.   Legal Standard*

"Under Article III . . . , plaintiffs must have a 'personal stake' in a case to have standing to sue." <u>Bost v. Ill. State Bd. of Elections</u>, 607 U.S. 71, 76 (2026) (quoting <u>FDA v. All. for Hippocratic Med.</u>, 602 U.S. 367, 379 (2024)). To demonstrate standing, the plaintiff must show (1) "that [it] has suffered or likely will suffer an injury in fact" that is "concrete," "particularized," and "actual or imminent," (2) "that the injury likely was caused or will be caused by the defendant," and (3) "that the injury likely would be redressed by the requested

judicial relief." All. for Hippocratic Med., 602 U.S. at 380-81 (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 424 (2021)).

"An organization with individual members may establish Article III standing" in two ways. Doe, 157 F.4th at 47; see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). First, the organization may "satisfy[] the three elements of . . . standing based on an 'injury in fact' of its own." Doe, 157 F.4th at 47 (quoting All. for Hippocratic Med., 602 U.S. at 394). This type of standing, known as organizational standing, requires that the organization itself "satisf[ies] the usual standards for injury in fact, causation, and redressability." All. for Hippocratic Med., 602 U.S. at 394. Alternatively, the organization "may establish 'associational standing' to sue in a 'representational capacity.'" Doe, 157 F.4th at 47 (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343, 345 (1977)). For this form of standing, "the organization must show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Id. (quoting Hunt, 432 U.S. at 343). The first factor is satisfied if one member of the organization would have standing to sue on his or her own. See Housatonic River Initiative v. U.S. EPA, 75 F.4th

248, 265 (1st Cir. 2023); Equal Means Equal v. Ferriero, 3 F.4th 24, 29 (1st Cir. 2021).

The plaintiff bears the burden of establishing standing and must meet this burden "with the manner and degree of evidence required at the successive stages of the litigation." TransUnion, 594 U.S. at 430-31 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). On a motion for preliminary relief, "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)). Courts "look at the allegations in the plaintiffs' complaint[] and the evidence from the preliminary injunction proceedings" in assessing standing at this stage. Doe, 157 F.4th at 47. In a multi-plaintiff action, "only one plaintiff needs standing for a suit to proceed." Bost, 607 U.S. at 76 n.3. And when, as here, the plaintiffs amend their complaint, courts measure standing as of the date of filing of the amended complaint. See Conservation L. Found. v. Acad. Express, LLC, 129 F.4th 78, 85-86 (1st Cir. 2025).

### 2. Analysis

Plaintiffs argue that they have adequately pled both organizational and associational standing. The Court finds that Plaintiffs American Nurses Association ("ANA") and American Association of Nurse Anesthesiology ("AANA") likely have

associational standing to challenge the Final Rule's definitions of "professional student" and "professional degree" and, thus, need not tackle Plaintiffs' other theories of standings. See Presidents' All. on Higher Educ. & Immigr. v. Noem, 824 F. Supp. 3d 168, 186 (D. Mass. 2026).

Plaintiffs have first shown that both ANA and AANA have at least one member who likely would have standing to sue on her own. See Housatonic River Initiative, 75 F.4th at 265; Equal Means Equal, 3 F.4th at 29. Plaintiffs have submitted a declaration from Ariannah Reece, an ANA member and registered nurse, describing the impact that the Final Rule's exclusion of APRN degrees from the OBBBA's higher loan limits for "professional" degrees will have on her plans to enroll in a DNP program. Reece has been accepted into the University of Oklahoma's DNP program, for which the annual cost of tuition, books, supplies, and other necessary expenses exceeds the $20,500 loan cap for "graduate" students. Reece does not have enough savings to cover these costs, does not believe that private loans are a viable option for her given their high interest rates and lack of repayment and forgiveness plans, and is unsure if she will be able to secure funding via other sources. Because of the "graduate student" loan cap, she has accepted a job at the University of Oklahoma's hospital, through which she is eligible for, but not guaranteed, tuition assistance. Reece states that if the Final Rule's classification of DNP students as

23

"graduate" students stands, she will not be able to pursue the degree.

Plaintiffs have submitted similar declarations from Hannah Hoppe, a nurse and AANA member, about her plan to enroll in a DNP in nurse anesthesia program at West Virginia University. Hoppe has accepted a spot in the program with a start date of August 17, 2026. Hoppe is unable to pay for the program with her savings, so she must take out student loans. The cost of attendance exceeds the $20,500 loan cap for "graduate" programs so, as of the filing of the amended complaint, Hoppe intended to apply for private loans to cover the balance. She is unsure whether she would be approved for such loans and, if she were, those loans would have higher interest rates and less favorable forgiveness and deferral terms that would impose a burden on her.

These declarations suffice to establish that Reece and Hoppe -- members of ANA and AANA, respectively -- likely would have standing themselves to challenge the Final Rule's definitions of "professional student" and "professional degree." An inability to pursue an educational opportunity, or a delay in the ability to do so, constitutes a concrete injury. See Ripa v. Stony Brook Univ., 808 F. App'x 50, 51 (2d Cir. 2020); E.L. ex rel. White v. Voluntary Interdistrict Choice Corp., 864 F.3d 932, 936 (8th Cir. 2017); AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *12]; see also Santa Monica Cmty. Coll. Dist. v. Mason, 952 F.2d 407, at *3 n.2

24

(9th Cir. 1991) (unpublished table decision) ("Losing access to higher education is unquestionably an injury."). Plaintiffs also allege, and Defendants do not dispute, that any private loan a student borrows may well carry a higher interest rate and less favorable terms than federal student loans. See Reimagining and Improving Student Education, 91 Fed. Reg. at 23856; AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *1]. The "[m]onetary costs" of taking on private loans with higher interest rates "are of course an injury" for purposes of standing. Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 111 (2025) (quoting United States v. Texas, 599 U.S. 670, 676 (2023)). At this stage, moreover, Reece's and Hoppe's declarations adequately indicate that their injuries are caused by their exclusion under the Final Rule from the higher loan caps for "professional" students and that enjoining or vacating the relevant aspects of the Final Rule would allow them to attend their desired programs and/or borrow fewer or no private loans with higher interest rates.

Defendants contest Reece's and Hoppe's standing primarily on the basis that any injury they may suffer is too speculative. This argument is unpersuasive. It is true that standing requires an injury that is "actual or imminent" rather than "speculative," All. for Hippocratic Med., 602 U.S. at 381, and that "nebulous '"some day" intentions -- without any description of concrete plans, or indeed even any specification of when the some day will

be -- do not support a finding of . . . "actual or imminent" injury,'" Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 326 (1st Cir. 2009) (alteration in original) (quoting Lujan, 504 U.S. at 564). Here, though, both Reece and Hoppe had already been accepted into DNP programs as of the date of filing of the amended complaint and were figuring out how to fund their education or whether they would be able to enroll in their respective programs at all. These "concrete plans" establish a sufficiently imminent injury for purposes of standing. Id. (quoting Lujan, 504 U.S. at 564); see AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *12] (finding standing to challenge the same aspects of the Final Rule at the preliminary relief stage based on an individual who was in the process of applying for a graduate program).

Defendants do not dispute, and the Court finds, that ANA and AANA likely satisfy the remaining requirements for associational standing. ANA's purpose is "to advance the nursing profession by fostering high standards of nursing practice, promoting a safe and ethical working environment, bolstering the health and wellness of nurses, and advocating on healthcare issues that affect nurses and the public." Dkt. 15 ¶ 7. For its part, AANA has a "mission . . . to support and advance nurse anesthesiology and the CRNA profession . . . through advocacy, research, education, and professional resources." Dkt. 16 ¶ 13. This lawsuit, which aims to increase the amount of federal student loans that students in APRN

26

degree programs may borrow, is "germane" to the organizations' purposes of advancing the nursing profession and advocating on issues that affect nurses. Doe, 157 F.4th at 47 (quoting Hunt, 432 U.S. at 343). And Plaintiffs' administrative law challenge to the Final Rule and request for equitable and APA relief in no way "requires the participation of individual members in the lawsuit." Id. (quoting Hunt, 432 U.S. at 343).

Finally, the Court notes that Defendants do not argue that the Department's guidance issued after the AANP court postponed the effective date of the Final Rule's definition of "professional degree" has mooted all or part of this lawsuit or affected Plaintiffs' Article III standing. That guidance does provide that the Department will treat MSN, DNP, and DNAP degrees as "professional degrees" while the AANP court's postponement remains in effect, but it expressly states that "the Department is confident that the professional degree definition in the . . . Final Rule is lawful and will continue to defend it." Dkt. 53-1 at 1. Because the Department "'vigorously defends' the legality of" the Final Rule, the guidance does not make "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." West Virginia v. EPA, 597 U.S. 697, 720 (2022) (quoting Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 719 (2007)). And while the guidance affects Plaintiffs' ability to show irreparable harm in the absence of preliminary

27

relief, see infra Section II, the Court measures Plaintiffs' standing as of the date of their amended complaint, see Conservation L. Found., 129 F.4th at 85-86, which was around a week before the guidance was issued.

### B.   Contrary to Law

Having confirmed that at least two Plaintiffs likely have standing to challenge the Final Rule's definitions of "professional student" and "professional degree," the Court turns to the merits. Plaintiffs' lead argument on the merits is that the Final Rule's exclusion of students in APRN degree programs from the OBBBA's higher loan caps for "professional" students is contrary to law in violation of the APA. See 5 U.S.C. § 706(2)(A) (directing courts to "hold unlawful and set aside agency action . . . not in accordance with law"). In Plaintiffs' view, the Final Rule's definition of "professional degree" includes requirements not set forth in the OBBBA's definition of the term and, thus, is contrary to the statute.

"When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020) (quoting City of Arlington v. FCC, 569 U.S. 290, 297 (2013)). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it." Id. (alteration in original) (quoting La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)).

28

If an agency acts "outside the bounds of its statutory authority," it "violates the" APA. Id. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and "may not defer to an agency interpretation of the law." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412-13 (2024); see Bruno Project Rescue Inc. v. CDC, __ F.4th __, __ (1st Cir. 2026) [2026 WL 2017744, at *3].

In a thoughtful and comprehensive opinion, the AANP court held that the Final Rule's "new definition of 'professional degree' is likely inconsistent with the definition of 'professional degree' set forth in the" OBBBA. __ F. Supp. 3d at __ [2026 WL 1826176, at *14]. The court explained that the definition Congress incorporated into the OBBBA from 34 C.F.R. § 668.2 has "three, and only three, criteria for a . . . professional degree: (1) the degree signifies 'completion of the academic requirements for beginning practice in a given profession'; (2) the degree signifies 'a level of professional skill beyond that normally required for a bachelor's degree'; and (3) licensure is 'generally required.'" Id. at __ [2026 WL 1826176, at *15] (quoting 34 C.F.R. § 668.2(b)). The court also noted that § 668.2's list of "professional" degrees is merely "illustrative." Id.; see 34 C.F.R. § 668.2(b) ("Examples of a professional degree include but are not limited to [ten types of degrees]." (emphasis added)).

29

The AANP court found that the definition of "professional degree" in the Final Rule "makes at least five material changes to the definition that Congress codified." __ F. Supp. 3d at __ [2026 WL 1826176, at *15]. The Final Rule added three express requirements to the definition, "specifying that a 'professional degree' [(1)] is 'generally at the doctoral level,' [(2)] 'requires at least six academic years of postsecondary education coursework for completion,' and [(3)] must fall within 'a four-digit CIP code . . . in the same intermediate group as the fields listed in' the list of ten examples adopted by the [OBBBA] or in Clinical Psychology." Id. (fourth alteration in original) (quoting Reimagining and Improving Student Education, 91 Fed. Reg. 4254, 4332 (Jan. 30, 2026)). The Final Rule next "converted the list of ten 'examples' of professional degree fields in [§ 668.2's] definition adopted by Congress into an exclusive list of qualifying degrees," with the sole addition of doctoral clinical psychology degrees. Id. (citation omitted). Lastly, the Department applied a "contextual" requirement that a degree is not "professional" if it leads to employment that is supervised by a different professional occupation, even though this requirement is not "included in the text of [§ 668.2's] definition." Id. at __ [2026 WL 1826176, at *16]. The AANP court held that these changes to the definition of "professional degree" are likely contrary to law because "Congress explicitly directed the Department to apply the preexisting

30

regulatory definition set forth in 34 C.F.R. § 668.2 as the relevant test," giving "the Department . . . no power to revise the definition Congress codified or to add additional substantive criteria." Id.

The AANP court rejected the Department's argument that it permissibly added these requirements to the definition of "professional degree" by analyzing the list of degrees in § 668.2's definition under the noscitur a sociis and ejusdem generis canons of statutory construction.[4] See id. at __ [2026 WL 1826176, at *17-18]. The Department's use of these canons, the court noted, was "misguided" both because the OBBBA's definition of "professional degree" is unambiguous and because "nothing suggests that the 'examples' provided in the list are meant to run the gamut of all possible types of professional degrees such that they would delineate the outermost bounds of the definition." Id. at __ [2026 WL 1826176, at *17]. The court also determined that the Department had misapplied these canons, as there was no ambiguous or catchall term requiring interpretation and none of the additional

---

[4] As previously noted, "the canon of noscitur a sociis teaches that a word is 'given more precise content by the neighboring words with which it is associated." Fischer, 603 U.S. at 487 (quoting Williams, 553 U.S. at 294). The "related canon of ejusdem generis" provides that "'a "general or collective term" at the end of a list of specific items' is typically '"controlled and defined by reference to" the specific classes . . . that precede it.'" Id. (alteration in original) (quoting Sw. Airlines Co. v. Saxon, 596 U.S. 450, 458 (2022)).

requirements are satisfied by all of the degrees listed in § 668.2's definition. See id. at __ [2026 WL 1826176, at \*17-18].

This Court agrees with, and adopts, the AANP court's analysis of this issue. The Final Rule added multiple requirements for a degree to qualify as "professional" that are contrary to § 668.2's unambiguous three-part definition that Congress incorporated into the OBBBA. See United States v. Pilson, 177 F.4th 82, 94 (1st Cir. 2026) ("If [the statutory text is plain and unambiguous], [courts] must apply the statute according to its terms." (first alteration in original) (quoting Littlefield v. Mashpee Wampanoag Indian Tribe, 951 F.3d 30, 37 (1st Cir. 2020))). Because the statute provides an unambiguous definition, the Department cannot rely on any of the cited canons of statutory construction to impose these additional requirements. See Consumer Data Indus. Ass'n v. Frey, 26 F.4th 1, 9 (1st Cir. 2022) ("When the words of a statute are unambiguous, . . . the first canon of statutory construction is also the last: judicial inquiry is complete." (cleaned up) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992))); Littlefield, 951 F.3d at 40 (explaining that "canons of statutory interpretation . . . apply only in cases of textual ambiguity").

The Court responds to one argument raised by Defendants here that was not addressed in AANP. Defendants argue that the Final Rule's requirement that a "professional degree" involve six or more years of postsecondary coursework and two or more years of

32

postbaccalaureate coursework is consistent with § 668.2's definition, as incorporated into the OBBBA, because that definition was drawn from one used by NCES at the time, which included the same length-of-completion requirement. This argument is unconvincing. The program length requirement in the Final Rule's definition of "professional degree" differs from the one in the definition Defendants say NCES used at the time. Contrast Reimagining and Improving Student Education, 91 Fed. Reg. at 23882 (requiring "at least two years of post-baccalaureate level coursework"), with Nat'l Ctr. for Educ. Stat., U.S. Dep't of Educ., NCES 2008-159, Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month Enrollment: 2006-07 B-2 (2008) (requiring "at least 2 years of college work prior to entering the program" (emphasis added)). Regardless, the Department did not adopt NCES's definition wholesale when it promulgated § 668.2 (which Congress later incorporated into the OBBBA) and, indeed, omitted any length-of-program requirement. That the Department expressly based this regulatory definition on NCES's definition but opted not to carry over any length-of-program requirement is strong evidence that the regulatory definition does not incorporate any such requirement. Cf. Acosta v. Loc. Union 26, UNITE HERE, 895 F.3d 141, 144 (1st Cir. 2018) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub

silentio to enact statutory language that it has earlier discarded in favor of other language." (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 442-43 (1987))).

Accordingly, the Court concludes that Plaintiffs are likely to succeed on the merits of their claim that the Final Rule's intertwined definitions of "professional degree" and "professional student" are contrary to law and, thus, invalid under the APA. The Court therefore does not address Plaintiffs' arguments that the Final Rule's exclusion of APRN students from the higher loan caps for "professional" students is also arbitrary and capricious.

## II.  Irreparable Harm

Having found a likelihood of success on the merits, the Court now addresses the next factor for issuance of preliminary relief, namely "whether and to what extent the movant will suffer irreparable harm in the absence of [such] relief." Becky's Broncos, 138 F.4th at 77 (quoting Russomano, 960 F.3d at 52). Plaintiffs argue that the Final Rule's exclusion of MSN, DNP, DNAP, and PhD in Nursing students from the higher loan caps for "professional" students will cause irreparable harm to certain members seeking to enroll in such programs who will be forced to either take out more onerous private loans or forgo enrollment altogether. Plaintiffs also contend that these effects on prospective students will, in turn, cause them irreparable harm as organizations, for instance, by having to devote resources to address disruptions caused by the

34

Final Rule's definitions of "professional student" and "professional degree."

There is no question that the types of harms Plaintiffs argue some of their members will suffer -- lost educational and professional opportunities and borrowing private loans with less favorable terms -- may be irreparable. A harm is irreparable for purposes of a request for preliminary relief if it "cannot adequately be compensated for either by . . . later-issued permanent [relief], after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005). Courts routinely treat "lost educational opportunities and an inability to pursue one's chosen vocation a[s] sufficient to establish irreparable harm." AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *19] (collecting cases); see Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Th[e] 'loss of opportunity to pursue [Plaintiffs'] chosen profession[s]' constitutes irreparable harm." (second and third alterations in original) (quoting Enyart v. Nat'l Conf. of Bar Exam'rs, Inc., 630 F.3d 1153, 1165 (9th Cir. 2011))). A final judgment at the close of the litigation also would not be able to compensate a student who takes out a burdensome private loan in the interim to finance a degree program. See AANP, __ F. Supp. 3d at __ [2026 WL 1826176, at *19].

Defendants contend that Plaintiffs have not shown that any prospective students will face these harms because the AANP court already postponed the effective date of the Final Rule's definition of "professional degree." But "district courts frequently issue overlapping preliminary [relief] on the same subject matter." Am. Encore v. Fontes, 152 F.4th 1097, 1121 (9th Cir. 2025) (rejecting the argument that issuing a duplicative injunction is improper); see CASA, Inc. v. Trump, 793 F. Supp. 3d 687, 698 (D. Md. 2025); All. for Retired Ams. v. Bessent, 770 F. Supp. 3d 79, 110 (D.D.C. 2025). As many courts have held, the "existence of . . . preliminary [relief] issued by another court that provides relief to the plaintiffs does not negate their irreparable harm." CASA, 793 F. Supp. 3d at 698; see All. for Retired Ams., 770 F. Supp. 3d at 110-11; Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs., 510 F. Supp. 3d 29, 41 n.4 (S.D.N.Y. 2020); Nw. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs., 496 F. Supp. 3d 31, 81 (D.D.C. 2020); California v. Health & Hum. Servs., 390 F. Supp. 3d 1061, 1065-66 (N.D. Cal. 2019). But see Hawai'i v. Trump, 233 F. Supp. 3d 850, 853 (D. Haw. 2017) (concluding that the state plaintiff would suffer no irreparable harm because another court's "nationwide injunction already provide[d] the State with the comprehensive relief it s[ought]"). After all, the AANP court's order "could be modified, limited, or overturned at any time." CASA, 793 F. Supp. 3d at 698.

Nonetheless, Plaintiffs' attempt to show irreparable harm with respect to MSN, DNP, and DNAP degrees has been forestalled by the guidance issued by the Department following the AANP court's postponement order. "Cessation of the allegedly illegal conduct, though not rendering a claim moot, nevertheless may affect the ability to obtain injunctive relief, as by impacting the ability to show substantial and irreparable injury." Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 748 (7th Cir. 1999); see Revenue Mgmt. Sols., LLC v. Com. Bank, __ F.4th __, __ (8th Cir. 2026) [2026 WL 2121783, at *5]; Moms for Liberty - Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ., 155 F.4th 499, 513-14 (6th Cir. 2025); Lofton v. Verizon Wireless (VAW) LLC, 586 F. App'x 420, 421 (9th Cir. 2014). The Department's guidance goes further than the AANP court's postponement order and affirmatively states that the Department will treat any program that awards an MSN, DNP, or DNAP and has a four-digit CIP code of "51.38" -- which covers programs for "Registered Nursing, Nursing Administration, Nursing Research and Clinical Nursing," Browse CIP Codes, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/ipeds/cipcode/browse.aspx?y=55 (last visited Aug. 10, 2026) (listing CIP codes) -- as awarding a "professional degree" for purposes of the OBBBA's loan caps while the AANP court's postponement order remains in effect. Plaintiffs do not dispute that this CIP code covers all MSN, DNP, and DNAP programs.

Because the Department has made clear that MSN, DNP, and DNAP students may now borrow up to the higher "professional student" loan caps, no such student currently faces the prospect of choosing between forgoing enrollment or taking on burdensome private loans as a result of the Final Rule's classification of MSN, DNP, and DNAP students as "graduate" rather than "professional" students. Although developments in the AANP case may cause the Department to withdraw this guidance in the future, the Court cannot conclude at this moment that "irreparable injury" for these students "is likely in the absence of" preliminary relief. Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior, 180 F.4th 348, 352 (1st Cir. 2026) (quoting Winter, 555 U.S. at 22). The same is true for the injuries Plaintiffs argue they will suffer as organizations as a result of the Final Rule's classification of MSN, DNP, and DNAP students as "graduate" students.

Students seeking to enroll in PhD in Nursing programs, the other degree at issue in this litigation, are in a different position. The Department's guidance does not provide that such students will be treated as "professional" students for purposes of the OBBBA's loan caps during the pendency of the AANP court's postponement. Thus, some PhD in Nursing students may currently face the choice between forgoing enrollment or taking on burdensome private loans as a result of the Final Rule's definitions of "professional student" and "professional degree."

38

That said, the current record does not support a finding that the Final Rule's classification of PhD in Nursing students as "graduate" students is likely to cause irreparable harm to Plaintiffs or their members. Plaintiffs submitted declarations from Teshieka Curtis-Pugh, an ANA member applying to programs awarding a PhD in global health equity, and Tracy Carrico, an ANA member aiming to eventually "enroll in a Ph.D. program with a focus on health equity and population health." Dkt. 36 ¶ 9. Plaintiffs have not demonstrated that either of these PhD programs awards a PhD in Nursing, which is the degree at issue in this case. The ANA also states that "many" advanced nursing students "are ANA members," Dkt. 15 ¶ 13, and Plaintiffs broadly allege that they have members who "plan to attend post-baccalaureate nursing programs" and "are now forced to change their plans," "forgo or delay enrollment in their desired program," or "finance their education through less favorable forms of financial assistance" as a result of their "inability to finance their education through federal loans." Dkt. 41 ¶¶ 90-92. Plaintiffs, however, do not specify that any of these members are seeking PhDs in Nursing, let alone identify a particular member seeking a PhD in Nursing and the circumstances that would cause that member to suffer irreparable harm from the Final Rule's classification of PhD in Nursing students as "graduate" students. Similarly, the ANA describes various harms it alleges it will suffer from the Final

39

Rule's exclusion of APRN students as a whole from the higher loan limits applicable to "professional" students -- such as interference with its mission of advancing the nursing profession and health care quality and fewer members to contribute to and purchase educational materials -- without explaining whether the exclusion of PhD in Nursing students specifically will cause the same harms. Plaintiffs' allegations and declarations about the other plaintiff organizations do not fill this gap in the record with respect to PhD in Nursing students.

Having concluded that Plaintiffs have not made the necessary showing of irreparable harm, the Court declines to issue a preliminary injunction barring the enforcement of, or postpone the effective date of, the Final Rule's definitions of "professional student" and "professional degree" with respect to MSN, DNP, DNAP, and PhD in Nursing students. See Nat'l Parks Conservation Ass'n, 180 F.4th at 351-52 (explaining that "[i]rreparable harm is a prerequisite for" both a preliminary injunction and an order postponing the effective date of agency action under § 705). The denial of Plaintiffs' motion for preliminary relief with respect to PhDs in Nursing is without prejudice to Plaintiffs supplementing the record concerning irreparable harm they or their members may suffer specifically from the Final Rule's classification of PhD in Nursing students as "graduate" students for purposes of the OBBBA's loan limits. The denial of Plaintiffs' motion with respect to MSNs,

40

DNPs, and DNAPs is without prejudice to renewal should the Department withdraw its guidance stating that it will treat those degrees as "professional."

### ORDER

For the foregoing reasons, Plaintiffs' motion for preliminary injunction and a stay (Dkt. 14) is **DENIED** without prejudice to supplementation or renewal consistent with this opinion.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

41

**GLOSSARY**

| AANA | American Association of Nurse Anesthesiology |
|------|---------------------------------------------|
| ANA | American Nurses Association |
| APRN | Advanced practice registered nurse |
| CIP | Classification of Instructional Programs |
| CNM | Certified nurse midwife |
| CNS | Clinical nurse specialist |
| CRNA | Certified registered nurse anesthetist |
| DNAP | Doctor of Nursing Anesthesia Practice |
| DNP | Doctor of Nursing Practice |
| PhD | Doctor of Philosophy |
| NP | Nurse practitioner |
| OBBBA | One Big Beautiful Bill Act |
| MSN | Master of Science in Nursing |
| NCES | National Center for Education Statistics |